IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| FLORIDA, GEORGIA and | : | |
| TENNESSEE ex rel. | : | |
| GEORGE E. MILLER, NHA, | : | |
|   MBA, FACHE | : | CIVIL ACTION NO. 10-cv-3007 |
|   and | : | |
| MICHAEL J. METTS, CPA, MHA | : | |
| | : | |
| Plaintiff | : | FILED UNDER SEAL |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| HEALTH MANAGEMENT | : | QUI TAM |
| ASSOCIATES, INC. | : | |
|   and | : | |
| ROSE CITY, LLC | : | |
|   and | : | |
| ROSE CITY HMA, INC, d/b/a | : | |
| LANCASTER REGIONAL | : | |
| MEDICAL CENTER | : | |
|   and | : | |
| LANCASTER HMA, LLC | : | |
|   and | : | |
| LANCASTER HMA, INC. d/b/a | : | |
| HEART OF LANCASTER | : | |
| REGIONAL MEDICAL CENTER | : | |
|   and | : | |
| PHYSICIANS ALLIANCE LTD. | : | |
|   and | : | |
| MICHAEL WARREN, MD | : | |
|   and | : | |
| WALLY LONGTON, MD | : | |
|   and | : | |
| LEE MEYERS | : | |
|   and | : | |
| GLENN KLINE, DO | : | |
| | : | |
| Defendants. | : | |

## FIRST AMENDED QUI TAM COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE FALSE CLAIMS ACTS, ANTI-KICKBACK STATUTES, AND PHYSICIAN SELF-REFERRAL LAWS

Qui Tam Relators George E. Miller and Michael J. Metts, through their counsel Pietragallo Gordon Alfano Bosick & Raspanti, LLP, bring this action on their own behalf, and on behalf of the United States of America and the States of Florida, Georgia and Tennessee, to recover civil damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.* and analogous state false claims acts. Defendants submitted or caused the submission of false claims to federal and state health programs as a result of illegal kickbacks that Defendants Health Management Associates, Inc. ("HMA"), and its facilities (Lancaster Regional and Heart of Lancaster) offered and paid, and kickbacks that physicians at HMA facilities, including members of Defendant Physicians Alliance Ltd. ("PAL") (Defendants Michael Warren, MD, Wally Longton, MD, and Lee Meyers, the CEO of PAL), and Dr. Glenn Kline, DO, solicited and/or received in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320-7b(b). Financial relationships created by the HMA Defendants with referring physicians also resulted in violations of the physician self-referral law, 42 U.S.C. § 1395nn (the Stark Law).

## I.      INTRODUCTION

1.      HMA is a multi-billion dollar corporation which owns and operates fifty-five (55) hospitals in primarily non-urban areas in 15 states. HMA, through its subsidiaries, including Lancaster HMA, LLC and Rose City, LLC, and/or Defendants Lancaster Regional and Heart of Lancaster, paid kickbacks to physicians participating in whole-hospital joint ventures of HMA facilities. HMA also paid kickbacks to physicians through excessive compensation and bogus co-

management or medical directorship fees. HMA paid these kickbacks so that the physicians would steer their patients to HMA owned facilities for in-patient and outpatient services. Defendants PAL, Warren, Longton, Meyers, and Kline, conspired with the HMA Defendants to cause the submission of false claims to government healthcare programs.

2.      HMA employed similar joint venture schemes at other HMA facilities around the country in order to induce local physicians to refer patients to HMA facilities. Referrals by physicians who have financial relationships with HMA to HMA facilities, violate the Anti-Kickback Statute and the Stark Law. The HMA Defendants (HMA and its subsidiaries, including Lancaster Regional, and Heart of Lancaster) conspired with the referring physicians to disguise the kickbacks and to conceal illegal referral relationships which violated the Stark Law.

## II.    JURISDICTION AND VENUE

3.      This action arises under the laws of the United States of America to redress violations of the federal FCA, 31 U.S.C. §3729 *et seq*., the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); and the Stark Law, 42 U.S.C. § 1395nn.

4.      Subject matter jurisdiction is conferred by 31 U.S.C. §3732(a) and 28 U.S.C. § 1331, 1345.

5.      The Court has jurisdiction over Defendants' violations of the Florida, Georgia and Tennessee Anti-Kickback Statutes, pursuant to 31 U.S.C. §3732(b) because Defendants' violations of Florida, Georgia and Tennessee laws and their violations of the federal FCA arise from the same transactions or occurrences. The Court has pendant jurisdiction over Defendants' state law violations because these violations and Defendants' violations of the federal FCA arise

out of a common nucleus of operative fact.

6.      The Court has personal jurisdiction over all of the Defendants because they are all located within the Eastern District of Pennsylvania and serve as health care providers to federal and state health care program beneficiaries, including Medicare and Medicaid beneficiaries, within the Eastern District of Pennsylvania.

7.      Each Defendant regularly performs healthcare services and submits claims for payment to federal and state health care programs, including, but not limited to, Medicare and Medicaid, and accordingly, is subject to the jurisdiction of this Court.

8.      Venue lies under 28 U.S.C. § 1391(b),(c), and 31 U.S.C. §3732(a) because Defendants transact business within this district and the facts forming the basis of this Complaint occurred within this district.

9.      The facts and circumstances of the Defendants' violations of the federal FCA have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit, or investigation, or in the news media.

10.     Relators are the original source of the information upon which this Complaint is based, as that phrase is used in the federal and state FCAs, and they have provided all of their information of the allegations of this Complaint to the governments prior to filing their Complaint.

III.   **THE PARTIES**

A.   **The Relators/Plaintiffs**

11.   Relator George E. Miller, NHA, MBA, FACHE ("Relator Miller") is a resident of Pennsylvania and citizen of the United States of America.

12.   Relator Miller is a senior hospital executive with over twenty-one (21) years experience in hospital administration, including seventeen (17) years' service as a hospital Chief Executive Officer.

13.   From June 2, 2008 until May 6, 2009, Relator Miller was employed by Defendant HMA as Chief Executive Officer of Defendant Heart of Lancaster. Moreover, he served as Chief Executive Officer of Defendant Lancaster Regional from June 2, 2008 until January 2009. During this same period, Relator Miller was also CEO of 13 physician clinics related to both hospitals.

14.   Relator Miller earned a B.A. from Temple University (1973) and an M.B.A. in Health Care Administration from Temple University (1983). Relator Miller is also a Fellow of the American College of Healthcare Executives (FACHE).

15.   Relator Michael J. Metts, C.P.A., MHA ("Relator Metts"), is a resident of Pennsylvania and citizen of the United States of America.

16.   Relator Metts earned a B.S. in Business Administration from the University of Central Florida (1992) and a Masters in Health Administration from the University of North Florida (1997).

17.   Relator Metts is a certified public accountant, licensed in the State of Florida, with

more than eleven (11) years experience in health care administration, including seven years as a hospital Chief Financial Officer ("CFO").  Realtor Metts earned his C.P.A. in 1994.

18.    From June 2, 2008 until September 25, 2009, Relator Metts was employed by Defendant HMA.  From June 2008 until December 2008, Relator Metts was the System Chief Financial Officer and Compliance Officer for Lancaster Regional, Heart of Lancaster and 13 related clinics.  From December 2008 until September 2009, Relator Metts was the Chief Financial Officer and Compliance Officer at Lancaster Regional.

19.    From June 2008 until May 6, 2009, Relators Miller and Metts both worked for Defendant HMA at its Lancaster, Pennsylvania facilities.  From June 2008 until December 2008, Relators Miller and Metts worked at both Lancaster Regional and Heart of Lancaster.

20.    From December 2008 until he left HMA in May 2009, Relator Miller worked at Heart of Lancaster and Relator Metts worked at Lancaster Regional.  However, during this December 2008 through May 2009 time period, Relators Miller and Metts attended joint meetings and exchanged information as HMA formed separate administrative teams for each Lancaster facility.

B.    **The Defendants**

1.    **Health Management Associates ("HMA")**

21.    Defendant Health Management Associates, Inc. ("HMA") is a Delaware for-profit corporation whose principal place of business is located at 5811 Pelican Bay Boulevard, Naples, Florida 34108.  HMA transacts business throughout the United States, including within the Eastern District of Pennsylvania.  It is one of the largest for-profit hospital management

companies in the United States.

22.     HMA is a publicly traded company, NYSE File No.: 1-11141, "HMA."   HMA was incorporated in Delaware in 1979, but began operations through a subsidiary that was formed in 1977.   HMA reported nearly $4.6 billion and $4.5 billion in net revenues in 2009 and 2008, respectively.

23.     Defendant HMA operates acute care hospitals, clinics and other health care entities located in predominately non-urban areas in the Southeast and Southwest of the United States.   As of December 2008, HMA had 32,700 employees nationwide. Through its subsidiaries, as of December 2009, HMA operated 55 hospitals in 15 states, totaling approximately 8,400 beds.   Approximately 30% of HMA's beds are in Florida facilities.

24.     HMA's facilities also include three (3) facilities in Pennsylvania, as well as facilities in Oklahoma, West Virginia and Washington State.   HMA's 2008 and 2009 Medicare revenues constituted 32% of net annual revenues.   Medicaid programs provided approximately 8% of net revenues in 2008 and 9% in 2009.

25.     In 2009, HMA's adjusted admissions grew 3.9%, fueled in part by HMA's physician recruiting efforts, including the addition of 149 physicians during the fourth quarter in 2009 alone.

26.     Effective January 27, 2014, Defendant HMA was acquired by and merged with Community Health Systems, Inc. ("CHS").

27.     After January 27, 2014, Defendant CHS continued to make distributions to owners of non-controlling interests in HMA subsidiaries, including physician shareholders in

whole hospital joint ventures between HMA and numerous referring physicians

## HMA'S CORPORATE STRUCTURE

28.     HMA is led by a President and CEO who is based at their corporate headquarters in Naples, Florida.

29.     On September 15, 2008, Gary D. Newsome became Defendant HMA's President and Chief Executive Officer.  He also joined HMA's Board of Directors at that time.  Prior to joining HMA, Newsome had been employed by Community Health Systems, Inc. ("CHS") as President of its hospital operations of the CHS division that included hospitals in Illinois, New Jersey, Pennsylvania, Tennessee and West Virginia.

30.     Until September 15, 2008, HMA's President and Chief Executive Officer was Burke Whitman.

31.     Peter Lawson served as Defendant HMA's Executive Vice President - Development, from April 1988 through April 2014. In that capacity, Lawson led  the development and implementation of HMA's nationwide whole-hospital joint venture scheme from 2006 though 2010.

32.     HMA leadership is comprised of five divisions, each of which is led by a division Chief Executive Officer ("CEO")/President.  These five division presidents report directly to HMA's President and Chief Executive Officer, who is currently Gary Newsome.

33.     HMA's Division 1, which includes Pennsylvania, is lead by Britt T. Reynolds, who joined HMA in 2008.  Prior to joining HMA, Mr. Reynolds was Vice President of Operations for Community Health Systems ("CHS"), where he managed hospitals in Illinois,

New Jersey, Pennsylvania and West Virginia.

34.     HMA's Division 1 President, Reynolds, works out of HMA's corporate headquarters in Naples, Florida, and he reports directly to Gary Newsome.  As Division 1 CEO, Reynolds is responsible for oversight of 12 hospitals located in Alabama, North Carolina, Pennsylvania and South Carolina, including Lancaster Regional and Heart of Lancaster.

35.     The Division 1 President and CEO is also responsible for physician clinics necessary to operate HMA's hospitals in Division 1.

36.     Each HMA Division is also led by a Chief Financial Officer ("CFO"), who, like the Division CEO, works out of HMA's Naples, Florida headquarters.  The Division CFO reports directly to the Division CEO.

37.     Since 2003, R. Chris Hilton has been HMA's Division 1 CFO and he is responsible for the financial operations of 12 hospitals located in Alabama, North Carolina, Pennsylvania and South Carolina, including Lancaster Regional and Heart of Lancaster.

38.     Like Reynolds, HMA Division 1 CFO, Hilton, works out of Naples, Florida, headquarters.  Hilton reports directly to Division I CEO, Britt Reynolds.

39.     Before Newsome became HMA's CEO in September 2008, HMA's Division 1 management consisted of Jay Finnegan, CEO, and Doug Browning, CFO. This team oversaw the operations of five hospitals within the division, including Lancaster Regional and Heart of Lancaster.   Prior to Gary Newsome's arrival in September of 2008, HMA's Lancaster, PA facilities were part of Division VII.

40.     When Newsome reorganized HMA's management structure in late 2008,

Finnegan became the CEO of an HMA hospital in Florida, and Browning left HMA for a startup company in Dallas, Texas.

41.     Prior to the HMA re-structuring in 2008, Relators Miller and Metts, as CEO and CFO, respectively, of Lancaster Regional and Heart of Lancaster, reported directly to Finnegan and Browning.  Following the HMA Division 1 reorganization, they reported directly to Division 1 CEO Britt Reynolds and Division 1 CFO Chris Hilton.

### HMA'S LANCASTER, PENNSYLVANIA
### FACILITIES AND RELATED PHYSICIAN  CLINICS

42.     Defendant HMA, together with local physicians, owns and operates Defendant Rose City HMA, LLC d/b/a Lancaster Regional Medical Center and Defendant Lancaster HMA, LLC d/b/a Heart of Lancaster Regional Medical Center.

43.     Prior to 2009, when HMA joint-ventured these facilities, Defendant HMA was the sole owner of both Lancaster Regional Medical Center and Heart of Lancaster Regional Medical Center.

### 2.     Lancaster Regional Medical Center ("HMA Lancaster Regional")

44.     Defendant Rose City HMA, LLC d/b/a Lancaster Regional Medical Center ("Lancaster Regional"), is a Pennsylvania limited liability corporation whose principal place of business is located at 250 College Avenue, Lancaster, Pennsylvania 17604.

45.     Defendant Lancaster Regional is a for-profit acute care hospital with approximately 200 licensed beds as of 2009, more than 680 employees and more than 500 physicians, which is Medicare Certified: 1966 / No.: 390061 (Acute Care).

46.     Defendant HMA acquired Lancaster Regional in July of 2000.

- 10 -

47.     Defendant Lancaster Regional reported net revenues of $83 million and $74.1 million in 2009 and 2008 respectively.  In 2008, traditional Medicare (not including patients in Medicare managed care plans) accounted for 43.4% of patient days at Lancaster Regional.  At this same time, Medicaid accounted for 5% of total patient days.

48.     As will be discussed below, on October 1, 2009, Defendant HMA entered into a joint venture to own and operate Lancaster Regional.  After forming Rose City HMA, LLC, HMA transferred 11% of the hospital's stock to a group of 135 local physicians.

**3.      Heart of Lancaster Regional Medical ("Heart of Lancaster")**

49.     Defendant Lancaster HMA, LLC d/b/a Heart of Lancaster Regional Medical Center ("Heart of Lancaster") is a Pennsylvania corporation whose principal place of business is located at 1500 Highlands Drive, Lititz, Pennsylvania 17543.

50.      Defendant Heart of Lancaster is a 144-bed for-profit acute care hospital with more than 270 full-time employees, which is Medicare Certified: No.: 390068.

51.     Defendant HMA acquired Heart of Lancaster in July 1999, which was then doing business as Community Hospital of Lancaster.

52.     In August 2004, Defendant HMA replaced the old Lancaster-based Community Hospital with a new facility located in Lititz, Pennsylvania, named "Heart of Lancaster Regional Medical Center."

53.     Defendant Heart of Lancaster reported net revenues of $44.5 million and $46 million in 2009 and 2008.  In 2008, Medicare accounted for 39% of Heart of Lancaster's total patient days.  During this same time, Medicaid accounted for 2% of total patient days (an

- 11 -

increase from 1% in 2007).

54.     As will be discussed below, in October 2009, HMA entered into a joint venture with local physicians to own and operate Heart of Lancaster.  After forming Lancaster HMA, LLC in March 2009, HMA transferred a portion of the hospital's stock to a group of local physicians.

## HMA'S LANCASTER, PENNSYLVANIA PHYSICIAN CLINICS

55.     HMA also owns and manages hundreds of physician clinics nationwide, many of whose operations are integral to the business of the HMA hospitals.

56.     In Pennsylvania, for example, there are approximately 20 physician clinics, many of whose operations are integral to the three Pennsylvania hospitals owned by HMA (Defendants Lancaster Regional and Heart of Lancaster, as well as HMA's facility in Carlisle, Pennsylvania).

57.     Specifically related to Defendants Lancaster Regional and Heart of Lancaster, HMA manages 13 clinics (encompassing approximately 40 physician positions), many of whose operations directly support and are necessary for the operations of HMA's two Lancaster, Pennsylvania-area hospitals.

58.     Before October 2009, HMA owned and managed these physician clinics through a number of subsidiaries, including Lancaster HMA Physicians Management, Inc. ("Lancaster HMA Physicians").

59.     On or about March 23, 2009, HMA created Lancaster HMA Physician Management, LLC, a Pennsylvania limited liability company.  Upon information and belief, this entity owns and manages HMA's physician clinics.

60.     Lancaster HMA Physicians does business through the following physician practice (clinic) entities:  Central Penn Medical Group; Central Penn Management Group; Heart of Lancaster Cardiology; Heart of Lancaster Internal Medicine; Heart of Lancaster OB/GYN Clinic; Heart of Lancaster Family Practice; Highlands Family Practice; Carlisle Urology; Cardiac & Vascular Surgeons of Lancaster; Cardiothoracic & Vascular Surgeons of Lancaster; Orthopedic Specialists of Central Pennsylvania; Pediatric Partners; Lancaster Pulmonary and Sleep Associates; and Lancaster Anesthesia Associates.   In addition, upon information and belief, HMA Physicians also does business as Community Surgical Associates, the clinic run by HMA employee and general surgeon, Glenn Kline, D.O.

61.     In 2008, the expected operating losses for these Lancaster clinics, which included anesthesia, orthopedics, cardiology, and pain management, were approximately $7.15 million. Nearly 75% of these losses, or $6.92 million annually, are attributed to the operations of the Defendant Lancaster Regional.  The remaining yearly losses of $230,000 are attributed to Heart of Lancaster.

**4.     Defendant Physicians Alliance Ltd. ("PAL")**

62.     Defendant Physicians Alliance Ltd. ("PAL") is a professional corporation organized under the laws of the Commonwealth of Pennsylvania.  PAL's principal place of business is located at 1600 Cloister Drive, Lancaster, PA 17601-2390.

63.     PAL was formed in 1998 by a group of family physicians and internists in order to avoid being employed by Lancaster General Hospital (a competing not-for-profit facility near Lancaster Regional), as well as to provide its members with a competitive advantage to purchase

goods and services and to negotiate with insurance carriers.

64.     Today, PAL members include approximately 100 physicians, predominantly primary care doctors (family doctors and internists), but also includes specialists, including two radiologists, two radiation oncologists and a general surgeon.

65.     Defendant Michael Warren, M.D., a family physician, has served  as President of PAL since 1998.

66.     Defendant Wally Longton, MD, a radiologist, was a leading physician member of PAL and an owner  in a radiation center,  Keystone Cancer Center, which was part-owned by PAL

67.     Defendant Lee Meyers, was  formerly employed  by Defendant HMA as a Regional Practice Manager.  He currently  serves as the Chief Executive Officer ("CEO") of Defendant PAL

68.     From 1998 until 2008, Defendant Meyers served as the CEO of Central Penn Management Group ("CPMG"), a physician management services organization that provides various services, including information technology, human resources, billing, accounting, and consulting, to physicians near HMA's Lancaster hospitals, including PAL physicians. When PAL acquired CPMG from HMA in 2008, Meyers became an employee and executive for PAL, continued in his position as CEO, and acquired an ownership interest in CPMG.

69.     Since 2008, Defendant Meyers has led both Defendant PAL and CPMG from the same business address at 1600 Cloister Drive, Lancaster, PA.

70.     In his capacity as CEO of CPMG (both during his employment with HMA and

afterward with PAL), Meyers has been involved personally in HMA's relationships with physicians who are in a position to refer patients to its Lancaster, Pennsylvania hospitals.

71.    In his capacity as CEO of  PAL (and CPMG), Defendant Meyers has been involved intimately in PAL business entities in addition to CPMG, including PAL physician practices, Willow Street Imaging, and Keystone Cancer Center.

72.    With Defendant Warren, PAL President, Defendant Meyers participated in negotiations with between PAL and HMA related to Defendant PAL's demands to participate in the Lancaster Regional joint venture.

## IV.    ALLEGATIONS

### A.  HMA Uses Whole-Hospital Joint Venture Schemes to Induce Local Physicians to Refer Patients to HMA Facilities in Violation of the Anti-Kickback Statute

#### 1.    HMA's Joint Venture Scheme Targets Referring Physicians

73.    The unique niche that HMA fills in the marketplace is to own, operate, or manage hospitals and clinics in non-urban and, at times, more rural locations throughout the United States.

74.    One of the reasons for creating this type of business model is to take advantage of enhanced reimbursements and other financial benefits the Medicare and/or Medicaid programs offer for rural or small urban disproportionate share hospitals.

75.    Since mid-2006, HMA has embarked upon an aggressive and concerted effort to boost HMA's profits by engaging in a national scheme to joint venture its facilities with local referral sources by inducing referring physicians with an opportunity to purchase an interest in the facility at a discount and to earn robust returns based on patient referrals.

- 15 -

76.    Internal HMA documents show that HMA expects physicians investing in the joint venture to refer patients to HMA's joint-ventured hospitals.

77.    HMA began to joint venture its hospitals in approximately 2006, formed the first two joint ventures in January 2007, and completed an additional five joint ventures (including a multi-hospital joint venture) in 2008.

78.    HMA's joint venture activities between January 2007 and the end of 2009 have resulted in twenty-four joint ventures with local physicians and/or other health care organizations who then own minority equity interests in the HMA hospitals.

79.    HMA facilities which have been joint-ventured since 2007 include, but are not limited to:

| HMA Hospitals | Location of Hospital | Inception Date of Joint Venture |
|---|---|---|
| Riverview Regional Medical Center | Gadsden, Alabama | January 23, 2007 |
| Williamson Memorial Hospital | Williamson, West Virginia | December 1, 2007 |
| Midwest Regional Medical Center | Midwest City, Oklahoma | February 1, 2008 |
| Multiple hospitals | North Carolina and South Carolina | March 31, 2008 |
| Novant Health, Inc. | | March 31, 2008 |
| East Georgia Regional Medical Center | Statesboro, Georgia | July 1, 2008 |
| Natchez Community Hospital | Natchez, Mississippi | November 1, 2008 |
| Pasco Regional Medical Center | Dade City, Florida | December 1, 2008 |
| Stringfellow Memorial Hospital | Anniston, Alabama | February 1, 2009 |

| Heart of Lancaster | Lancaster, Pennsylvania | Late 2009 |
| Lancaster Regional | Lancaster, Pennsylvania | October 1, 2009 |

80.    Defendant HMA also completed physicians investment interests in other HMA hospitals, including a joint venture of Brooksville Regional and Springhill Regional, called "Hernando," which involved HMA's acquisition of a surgery center, as well as the following: Pasco Regional in Dade City, Florida; Paul B. Hall in Paintsville, Kentucky; University Medical Center, Lebanon, Tennessee and Harton Regional Medical Center in Tullahoma, Tennessee; Toppenish Community Hospital and Yakima Regional Medical Center in Washington state; Carlisle Regional Medical Center in Carlisle, Pennsylvania; Summit Medical Center in Van Buren, Arkansas;   Poplar Bluff Regional Medical Center in Missouri; Medical Center of Southeastern Oklahoma in Durant, Oklahoma; Carolina Pines Regional Medical Center in Hartsville, SC; and HMA's interest in Lake Norman Regional Medical Center located in Mooresville, NC.

81.    According to the JV PowerPoint presentations that HMA prepared for and provided to Relators for the Pennsylvania hospital joint ventures, HMA's physician joint venture of Riverview Regional Medical Center, Gadsden, Alabama included 53 physician investors, whom HMA reported each paid $150,000 for their investment in the hospital joint venture.

82.    According to the JV PowerPoint presentations that HMA prepared for and provided to Relators for the Pennsylvania hospital joint ventures, the physician joint venture of Williamson Memorial, Williamson, West Virginia, included 22 physicians, whom HMA reported each paid $70,000 for their investment in the hospital joint venture.

- 17 -

83.    According to the JV PowerPoint presentations that HMA prepared for and provided to Relators for the Pennsylvania hospital joint ventures, the physician joint venture of East Georgia Regional Medical Center, Statesboro Georgia, included 70 physicians, whom HMA reported each paid $220,000 for their investment in the hospital joint venture.

84.    When Relators began their employment with HMA, executives there (including Peter Lawson, HMA Vice President of Development, and Division 1 CEO Jay Finnegan) communicated a sense of urgency to complete as many joint ventures as possible because HMA executives feared that legislation pending before Congress in 2008 would prohibit joint ventures between hospitals and physicians entirely.

85.    According to HMA executives this legislation, (contained in Section 1156 of the Affordable Health Care for America Act (House Bill) and Section 6001 of the Patient Protection and Affordable Care Act (Senate Bill)), would place restrictions on the whole hospital exception to the Stark Law.

86.    During 2009 alone, HMA completed whole-hospital joint ventures between 16 HMA hospitals and local physicians.

87.    HMA has reported that, during 2009, physician ownership in HMA hospitals have resulted in physicians, whose specialties include OB/GYN and Cardiology, moving their practices solely to HMA's hospitals.

88.    This proposed legislation prohibiting physicians from owning shares in a hospital was passed in 2010 through the Patient Protection and Affordable Care Act, § 6001 *et. seq.*

2. **HMA's Business Model for Physician Ownership in HMA Facilities**

89.     Although HMA refers to its ownership of hospitals with referring physicians as "joint ventures" or "syndications," HMA's ultimate goal was to have potential referring physicians invest in HMA hospitals by purchasing shares in a newly-created LLC which owned the hospital, creating a form of syndication of the hospital.

90.     Upon information and belief, the syndication proposals for HMA facilities were developed at the direction of HMA's divisional executives and then presented to HMA's Board of Directors for approval.

91.     HMA corporate executives, based in Naples, Florida, disseminated a common business model for all HMA hospital syndication proposals.  The structure of each syndication included, but was not limited to:  (1) the creation of an LLC so that shares in the LLC could be acquired by the joint venture physicians; (2) the purchase and assumption by the LLC of leases of all the assets including buildings, equipment, and working capital; and (3) a management agreement between the participating physicians and HMA, Inc.

92.     The articulated reasons for HMA's hospital syndications were to:  (1) improve quality and risk management; (2) increase physician involvement; (3) produce a reasonable return on investment to all investors; and (4) increase efficiency and align interests of all investors.

93.     HMA Executive Vice President of Development Peter Lawson routinely made syndication presentations to targeted physicians which included references to HMA's pending and/or completed joint ventures.

- 19 -

94.    Lawson would use HMA's completed syndications to illustrate the forecasted financial growth for the proposed syndication facility, as well as the return on investment to be expected by targeted physicians.  HMA based its financial forecast on modest post-syndication admission volume increases (1-2 new admissions per day) from joint venture physicians' referrals to the syndicated hospital.

### 3.    HMA's PowerPoint Presentations to Physicians

95.    HMA's corporate modus operandi for presenting syndication opportunities to targeted physicians included a polished presentation by HMA corporate executives of well-rehearsed "return on investment" PowerPoints.

96.    The PowerPoint presentations for syndications were prepared, vetted, and presented by HMA corporate executive Peter Lawson, Executive Vice President of Development.

97.    The HMA "whole hospital joint venture" PowerPoint presentations for all facilities were substantially similar with minor tailoring for individual hospitals.

98.    The HMA PowerPoint began with background information on the particular facility, a description of its "Core Service Lines," and a listing of new technologies.

99.    The HMA PowerPoint presentations highlighted the following "purposes of joint venture:"

       1.    improve quality and risk management;

       2.    increase physician involvement;

       3.    produce a reasonable return on investment to all investors; and

       4.    increase efficiency and align interests of all investors.

100.    HMA's joint ventures were based on a common structure:  (1) the formation of a limited liability company (LLC) to own the assets; (2) the placement of a medical advisory group to advise the new entity on strategy and operations; (3) the establishment of a Board of Directors to make "major balance sheet decisions;" and (4) retention of the existing hospital governance (medical staff and community board).

101.    HMA's joint venture model was based on the joint-ventured LLC purchasing and assuming all of the leases related to the facilities' assets, which would then be managed pursuant to a management agreement with HMA, Inc.

102.    Although HMA's purposes for entering into joint ventures allegedly included "improve quality and risk management," HMA included in its PowerPoints little, if any, information on improvements in these areas at other joint-ventured facilities.

103.    The HMA PowerPoints lacked specifics regarding improvements to quality or risk management, HMA detailed the specific financial arrangements that would allow for "liquidity and cash management."

104.    At times, HMA Vice President Peter Lawson would refer superficially to improved quality by inserting a one-slide testimonial consisting of a photo of a smiling physician and a statement that physicians with an ownership interest would be more focused on quality of service and assets.

105.    In contrast, HMA's PowerPoints also provided prospective physicians/joint owners with detailed financial charts and graphs illustrating the successes of HMA's existing joint venture facilities.  In particular, HMA detailed these other HMA facilities' post-joint venture

- 21 -

adjusted daily census, cash flow, cash distributions, and average annual cash return on investment (ROI).

106.     HMA presented prospective joint venture physicians with projected annual cash distributions and cash ROI from their investment in the joint venture, provided 5-year projections, and quoted the targeted physicians a 20% average annual cash ROI over the first five years.

107.     HMA incorrectly advised the prospective joint venture physicians that the proposed joint venture was in full compliance with applicable Fraud and Abuse Laws, including the Stark Law and the federal Anti-Kickback Statute ("AKS").

108.     The physicians' investment in HMA facilities is calculated at far less than fair market value, resulting in a violation of the Anti-Kickback Statute.

109.     HMA's well-developed PowerPoint describes the investment opportunity that the joint venture provided for targeted physicians, including:  calculations of the initial offering price as "wholesale" hospital value less discounts offered to the physicians; the price per investment unit; the minimum and maximum individual investment units; and the minimum total physician investment required for the joint venture to be completed.

110.     HMA applied three types of discounts to the wholesale hospital value:   1) marketability discount; 2) corporate debt risk discount; and 3) control discount.

111.     Although the HMA PowerPoint did not define the term "marketability discount," HMA's executive, Peter Lawson, described this term as accounting for the difference between owning publicly-traded stock and owning an interest in the syndication.  Upon information and

belief, the marketability discount was intended by HMA to reflect restrictions on the joint venture physicians' ability to resell their shares.

112.    HMA did not define either the corporate debt risk discount or the control discount in its PowerPoint or during the joint venture presentations.

113.    HMA applied these discounts arbitrarily, meaning the number of discounts and the amount of the discount were selected by HMA executives.

114.    The HMA PowerPoint reflects HMA's basic joint venture model of a minimum total physician investment of 10% and a maximum 40% of the joint-ventured facility.

115.    HMA's PowerPoint discusses the targeted physician's ability to buy into the HMA facility at a price calculated by applying discounts to the hospital's "wholesale" value, but the cash ROI presented to physicians is based on "potential fair market value."

116.    The discounted offering price and the robust return on investment HMA projected constituted an inducement by HMA to referring physicians to participate in the joint venture and to refer patients to the joint-ventured facility.

117.    HMA's PowerPoint presentations end with highlights of HMA's "major capital expenditures" at the particular facility, a description of "next steps," and the instruction that targeted physicians should contact HMA's Executive Vice President, Peter Lawson, directly with any questions.

118.    Peter Lawson also made available to the physician audience the names and contact information for 114 physicians who were participating in other HMA joint ventures.  These "successful" joint ventures involved HMA facilities in Gadsden, Alabama, Statesboro, Georgia

and Williamson, West Virginia.

119.   HMA also noted prominently in the joint venture presentation HMA's concern that federal legislation would be passed that will ban physician ownership of hospitals.

**4.   Heart of Lancaster Joint Venture:   Continuing HMA's National Joint Venture Scheme to Attract Referrals**

120.   When Relator Miller became CEO of Lancaster Regional and Heart of Lancaster hospital in June of 2008, he was told by Jay Finnegan, Division 1 CEO, that HMA executives wanted to pursue a syndication with physicians whose practices were in and around Heart of Lancaster in order to make a success of a lackluster facility and to capitalize on physicians who could refer patients there.  This would also help HMA gain greater market dominance in the local market.

121.   In July or August, 2008, Relators Miller and Metts were told to begin preparing for the Heart of Lancaster joint venture presentation to be made to targeted physicians.

122.   At that time, Lawson provided Miller and Metts with a model HMA joint venture PowerPoint presentation which had been made for another HMA facility, Davis Regional Medical Center.

123.   The model joint venture PowerPoint for Davis Regional included figures for increases in patient census, cash flows, and return on investment ("ROI") for two other joint-ventured HMA facilities, one in Alabama and another in West Virginia.

124.   Metts took the Davis Regional joint venture PowerPoint and tailored the financial information with financial data related to Heart of Lancaster.

125.   Relators Miller and Metts created a document based on the HMA model

- 24 -

PowerPoint titled "Heart of Lancaster, LLC, Whole Hospital JV Summary of Presentation."

126.    The structure for the Heart of Lancaster joint venture included the formation of an "LLC," which would invest in the hospital (but which excluded related physician clinics), a valuation of the LLC based on cash flow, and governance based on an operating agreement.

## HEART OF LANCASTER PRESENTATION - HMA'S
## VICE PRESIDENTLAWSON – FOCUS ON RETURN ON INVESTMENT ("ROI")

127.    To illustrate the estimated ROI to Heart of Lancaster physicians, HMA's Lawson used physician investment figures from HMA facilities in West Virginia, Alabama, and Georgia, as well as joint venture performance data from Alabama and West Virginia.

128.    In its PowerPoint, prepared under Lawson's direction, HMA represented to the Heart of Lancaster physicians that they could expect an estimated ROI of 18.4% to 22% per year over five years.   The HMA PowerPoint highlighted the ROI based on an increase of 1-2 additional daily admissions to HMA's joint-ventured Davis Regional Medical Center facility. For example, an increase of one admission per day (365 days per year) would equate to a 15% increase in annual admission volume for Heart of Lancaster.

129.    In its Heart of Lancaster PowerPoint, presented by Lawson, HMA represented that the joint venture physicians could expect an estimated annual ROI which could average 20% but that the total return on their investment over five years could average 30% per year, based on a very modest volume change of less than one (1) additional admission per day.

## HMA'S KICKBACK TO THE HEART OF LANCASTER
## PHYSICIANS:  AN UNDERVALUED FACILITY

130.    At the time of the Heart of Lancaster joint venture, HMA ascribed a "wholesale"

value to Heart of Lancaster of $62,406,000. This figure was arrived at by using an estimated multiple of eight times the hospital's cash flow from operations.

131.   To this wholesale value, HMA applied multiple discounts to arrive at an "initial offering price" of $40,564,000; a heavily discounted investment opportunity utilized to induce targeted physicians to participate in the joint venture.

132.   HMA's PowerPoint for Heart of Lancaster included an offer to transfer a minimum 10% or a maximum of 40% ownership interest in the hospital to the joint venture physicians in exchange for $4,056 per investment unit ($40.56 million divided by 10,000 investment units). In other words, the joint venture physicians would have to buy a total of 1,000 units to meet HMA's intended minimum joint venture ownership interest of 10%.

133.   HMA expected and fully intended that physicians who participate in the joint venture accept HMA's offer to refer patients to the joint-ventured facility. There was no other meaningful reason to enter into the venture.

134.   HMA intentionally undervalued Heart of Lancaster in order to induce referring physicians, including Defendant PAL, to participate in the joint venture by offering them an interest in the facility at a price far less than its fair market value.

135.   HMA applied a 20% "marketability discount to the wholesale value." HMA did not define the term "marketability discount" in the written PowerPoint presentation. However, Lawson described this term generally during the Heart of Lancaster presentation as accounting for the difference between owning an interest in the syndication and owning publicly-traded stock.

136.   In contrast to Lawson's justification for the marketability discount (which indicated a lack of liquidity of the physician's interest) the terms of the Heart of Lancaster joint venture specifically permitted the physician investor to sell their shares back to HMA in the following circumstances:  1) annual physician rights to divest based on the lowest of fair market value or original price; or 2) repurchase by the HMA joint venture partnership for fair market value on the occurrence of a trigger event.  Trigger events included, but were not limited to: disability; retirement; divorce; or even departure.

137.   As a point of comparison, when HMA was contemplating buying into a separate joint venture of an ambulatory surgical center, the valuation company, Wellspring, ascribed a 15% marketability discount in light of a six year freeze on HMA's ability to sell its interest.

138.   In addition, HMA applied both a 10% "corporate debt risk" and a 5% "control" discount to the wholesale hospital value for Heart of Lancaster.  Neither discount was defined by HMA in the PowerPoint.  HMA illegally applied these discounts because HMA would not have provided either discount to a potential buyer which lacked the ability to refer patients to the hospital.

139.   Applying these discounts (20% "marketability" + 10% "corporate risk" + 5% "control") results in a 35% discount on the $62,406,000 wholesale value, for a total $21,842,000 discount applied to the Heart of Lancaster joint venture, resulting in a $40,564,000 offering price.

140.   As a result of HMA's artificially low valuation of Heart of Lancaster, all of the joint venture physicians were induced to participate in the joint venture at a price which was far

below fair market value.

141.    The artificial nature of HMA's valuation of its joint venture facilities is reflected in the fact that, upon information and belief, HMA did not adjust the facility balance sheet after the completion of a joint venture.

142.    If HMA's "initial offering price" for the joint-ventured hospital presented to the physician investors had actually reflected a fair value, HMA's valuation at considerably less than the book value reported on HMA's balance sheet would be problematic.  This practice violates generally accepted accounting principles (GAAP) and guidance provided by the Federal Accounting Standards Board (FASB 144), which call for writing down assets if an entity becomes aware that a change is necessary because the carrying value (historic value) is materially incorrect.

143.    In contrast to generally accepted accounting principles, HMA discounted its facilities and offered referring physicians the opportunity to invest in the facility substantially below and without reference to fair market value.  HMA discounted its facilities in order to solicit physician participation in the joint venture, and to induce physicians with shared ownership to refer patients to the joint-ventured facility.

144.    HMA provided a kickback to the targeted referring physicians who participated in the Heart of Lancaster joint venture, namely the difference between the fair market value of the interest transferred by HMA to the joint venture physicians and the discounted price the physicians paid to HMA.

145.    The Anti-Kickback Statute safe harbors do not protect HMA's offer or physician

investors' acceptance of the discounted joint venture investment opportunities.

146.     During the presentation of the Heart of Lancaster proposal to physicians in the summer of 2008, Lawson outlined the following "next steps:"

- valuation in progress

- produce prospectus and offering in October [2008]

- new company starts in December [2008].

147.     The Heart of Lancaster joint venture was presented twice.  First, Lawson made a presentation during the second or third week of August, 2008, to approximately 15 physicians who gathered in a conference room at Heart of Lancaster.  Lawson led this discussion by telephone conference because his travel plans were interrupted by a hurricane in Florida. Lawson made a second presentation at a function held at Bent Creek Country Club in Lititz, Pennsylvania, on September 3, 2008.

148.     This initial attempt, during the summer of 2008, by HMA executives to joint venture Heart of Lancaster failed to develop momentum because at that time, HMA executives were preparing for the anticipated transition in September of 2008 in HMA's chief executive position from Burke Whitman to Gary Newsome.

## HMA'S TEMPLATE JOINT VENTURE PROPOSAL

149.     In approximately September 2008, HMA's then Division 1 CEO, Jay Finnegan, told Relator Miller, then CEO of Heart of Lancaster and Lancaster Regional, that the hospital-level CEOs, including Miller, were expected to produce joint venture proposals for their facilities to present to HMA's newly-installed CEO, Gary Newsome.

150.   Finnegan also told Miller that HMA executives wanted to pursue a joint venture with physicians whose practices were in and around Heart of Lancaster in order to obtain these physicians' referrals.   In fact, Jay Finnegan, HMA CEO, Burke Whitman, former CEO, and Kelly Curry, HMA's then Chief Operating Officer ("COO"), had already approved a joint venture for Heart of Lancaster.

151.   Shortly after Gary Newsome's arrival at HMA, in October of 2008, Relators Miller and Metts began to prepare their joint venture proposal to present to HMA's new CEO and to the HMA Board of Directors.

152.   Finnegan provided Relator Miller with a word document to use as a template for the Heart of Lancaster joint venture proposal. HMA's template joint venture proposal had been utilized for the joint venture of a HMA facility, University Medical Center,  located in Lebanon, Tennessee, just outside Nashville.

153.   At Finnegan's direction, on or about October 6, 2008, Relator Miller began to revise the HMA template proposal, changed the title to: "Proposal for Board Approval: Sale of Minority Interest in Heart of Lancaster HMA, Inc," and revised the remainder of the proposal to reflect data specific to the Heart of Lancaster transaction.

154.   The Heart of Lancaster joint venture proposal by Miller was addressed to the following HMA executives: Jay Finnegan, Senior Vice President and Division 1 CEO; Peter Lawson, Executive Vice President of Development; Gary Newsome, President and Chief Executive Officer, HMA;  and Health Management Associates, Inc. Board of Directors.

155.   HMA's October 2008 joint venture proposal for Heart of Lancaster clearly reveals

that HMA's earlier PowerPoint offering price of $4,056 per unit. This initial offering price was based on HMA's internal estimate of Heart of Lancaster's "wholesale hospital value" of $62.4 million. Amazingly, as late as October 6, 2008, HMA had not obtained an independent "external valuation" of Heart of Lancaster.

156.   The October 2008 Heart of Lancaster joint venture or syndication proposal shows that HMA used an "internal estimate" of the facility's value and then arbitrarily applied "debt covenant," "marketability," and "control" discounts, in order to justify the severely discounted "estimated offering price" of $40.4 million HMA presented to targeted referring physicians.

157.   HMA arrived at this offering price of $40.4 million for Heart of Lancaster at the time of both the summer 2008 PowerPoint presentations to targeted joint venture physicians, as well as the October 2008 joint venture proposal to HMA's new CEO and Board of Directors for approval.

158.   As with HMA's other joint ventures, the Heart of Lancaster's joint venture proposal provided for the formation of an LLC, with HMA maintaining a majority ownership. Physicians, limited to eligible Heart of Lancaster staff members, were given the opportunity to purchase a minimum 10% interest in the facility.

159.   Jay Finnegan provided Relators Miller and Metts with the basic framework for the Heart of Lancaster joint venture.

160.   Upon information and belief, Finnegan had received the Heart of Lancaster joint venture framework from HMA's Vice President of Development, Peter Lawson.

161.   HMA's executives at the highest level, including Lawson, HMA's Executive Vice

President - Development, from April 1988 through April 2014, were involved in and approved the Heart of Lancaster joint venture in the summer of 2008, and CEO Newsome re-affirmed the joint venture when he assumed the leadership of HMA in the fall of 2008.

162.   HMA created Lancaster HMA, LLC, a Pennsylvania limited liability company, on March 23, 2009.  As of June 19, 2009, Lancaster HMA, LLC was listed as the owner of Heart of Lancaster Regional Medical Center.   Upon information and belief, in October 2009, after Relators left HMA, Lancaster HMA, LLC was later syndicated to the joint venture physicians.

163.   Upon information and belief, the Heart of Lancaster joint venture entity was ultimately ascribed a value between $40 and $50 million, and HMA was able to transfer only a 1.2% ownership to referring doctors, including Dale Lent, D.O. and Defendant Glenn Kline, D.O.

**5.      Lancaster Regional Joint Venture:    Continuing HMA's National Joint Venture Scheme**

164.   In approximately February or March 2009, Relator Metts learned that HMA also intended to joint venture Lancaster Regional.

165.   During this time period, early 2009, Relator Metts was CFO of Lancaster Regional.

166.    Relator Metts learned that HMA's proposed Lancaster Regional joint venture, consistent with HMA's other joint ventures throughout the country, involved transferring a minimum 10% interest in the hospital to local Lancaster-area physicians.

167.   HMA executives viewed Defendant PAL as integral to Lancaster Regional's success.  Prior to the joint venture, only 35% of the Defendant PAL patients were referred to

Lancaster Regional, the remaining 65% of Defendant PAL patients were referred to HMA's prime market competitor, Lancaster General Hospital. Lancaster General Hospital is a 590 bed facility located near the two HMA owned hospitals. Lancaster General also operates two smaller facilities in the Lancaster, PA market: Lancaster Women & Babies Hospital and Lancaster Rehabilitation Hospital.

168. In early 2009, Steve Midkiff (then interim CEO of Lancaster Regional), informed Relator Metts that HMA's Division 1 CEO Britt Reynolds wanted to enter into a joint venture (syndication) with the Defendant PAL physicians in order to induce the physicians to influence their referral patterns.

169. HMA's joint venture plan for Lancaster Regional was to transfer a minimum 10% ownership interest in Lancaster Regional to the participating physicians; the joint venture physicians would purchase shares in a discounted facility; and the joint venture physicians would enter into a management relationship with HMA, Inc.

170. On March 23, 2009, HMA created Rose City HMA, LLC, a Pennsylvania limited liability company. Rose City HMA, LLC was listed as the owner of Lancaster Regional Medical Center as of June 19, 2009.

171. In the spring of 2009, HMA's Executive Vice President Peter Lawson, travelled to Lancaster Regional and met with Relator Metts and the facility's interim CEO, Midkiff. At that time, Lawson provided HMA's standard PowerPoint presentation for Metts to tailor for the Lancaster Regional facility.

172. Lawson also played an active and integral role in developing the final Lancaster

Regional joint venture PowerPoint presentation. He provided Relator Metts with the standard HMA PowerPoint and facilitated changes to finalize the presentation.

173.   On several occasions between May and August 2009, Lawson delivered the Lancaster Regional PowerPoint presentation at Lancaster Regional's auditorium; approximately 100 local physicians attended each presentation. The attendees included, but were not limited to, the following physicians who were Defendant PAL members: PAL's President, Defendant Mike Warren, M.D.; Robert Springer, M.D.; Defendant Wally Longton, M.D.; and PAL family practice physicians. Non-PAL physicians also attended the Lancaster Regional joint venture presentations, including Danny Kagel, M.D., a Lancaster Regional Board member, Anthony Mastropietro, M.D., Lancaster Regional's Chief Medical Officer ("CMO"), and Nick Madelicus, M.D., a cardiologist.

## UNDERVALUING LANCASTER REGIONAL CONSTITUTES A KICKBACK

174.   At the time that the Lancaster Regional joint venture was presented, HMA ascribed a "wholesale" value to Lancaster Regional and to this "wholesale" hospital value, HMA arbitrarily applied a 10% marketability discount to arrive at an "initial offering price" of approximately $76 million.

175.   After intentionally undervaluing the Lancaster Regional facility, HMA offered to transfer to the joint venture physicians a minimum 10% share of Lancaster Regional's $76 million discounted value. The joint venture attracted $8.36 million in physician investment (through cash and asset transfers), and approximately 1,106 shares were purchased at $7,600.00 per share.

- 34 -

176.    Thus, HMA undervalued its Lancaster Regional facility in order to induce all of the targeted local physicians to participate in the joint venture scheme and thereby make referrals to HMA's facility.

177.    The kickback resulted from the fact that HMA offered the joint venture physicians the opportunity to buy into the Lancaster Regional syndication at less than the fair market value.

## EXCLUDING PHYSICIAN CLINIC LOSSES:
## STARK AND ANTI-KICKBACK STATUTE VIOLATIONS

178.    Upon information and belief, HMA's syndication of Lancaster Regional excluded costs associated with physician clinics whose services are essential to Lancaster Regional's operations.   These clinics include, for example, anesthesia and nurse anesthetists, whose operations resulted in a $3.0 million loss to HMA in 2008.

179.    When HMA presented the Lancaster Regional joint venture to targeted physicians, it clearly omitted the losses from these physician clinics in order to make the joint venture more attractive to targeted prospective physician investors.

180.    Upon information and belief, after the joint venture of Lancaster Regional closed, HMA omitted these physician clinic losses from the operating expenses in the hospital's profit and loss ("P&L") statements.   By not matching the operating expenses to the Hospital, the operating margin is overstated.   This inflated operating margin results in disproportionate distributions of revenue to joint venture investors.   This constituted an ongoing kickback to the joint venture physicians.

181.    In other words, HMA supplied $3.0 million in free anesthesia and nurse anesthetist services to the Lancaster Regional joint venture, which then benefits financially from

the free services of the physician clinics.  However, due to HMA's exclusion of the normal and recurring costs, normal and recurring expense is inappropriately excluded from the joint-ventured hospital's operating margin.  The operating margin is the basis for the distribution to physician owners.

182.    HMA's exclusion of the essential physician clinics practices from the joint venture results in a disproportionate return on investment to the physician investors and means that the joint venture structure violates the Anti-Kickback Statute.

183.    In contrast to its joint ventures with referring physicians that excluded physician clinic (a/k/a physician practice) losses, in March 2008, HMA entered into a joint venture of a number of hospitals in North Carolina and South Carolina with competitor Novant Health, Inc.. In that joint venture, both parties to the joint venture (HMA, the majority JV partner, and Novant) were required to contribute to the "losses" of the physician practices that were affiliated with the joint ventured hospitals.

184.    For Fiscal Year Ended (FYE) December 31, 2008, HMA marked its obligation under the Novant Joint Venture with a $7.9 million charge which represented the present value of HMA's estimated contribution to losses of the physician practices affiliated with the Novant joint venture hospitals. The HMA-Novant joint venture was restructured in 2009.

### HMA GIVES ADDED "INDUCEMENTS" TO 100 TARGETED PHYSICIAN ALLIANCE OF LANCASTER, LLC ("PAL") PHYSICIANS

185.    The Lancaster Regional joint venture was created as a vehicle to specifically attract Defendant PAL physicians who have the ability to refer patients to Lancaster Regional.

186.    While HMA did not exclude non-PAL physicians who wanted to participate in the

Lancaster Regional joint venture, the participation of Defendant PAL's physicians was critical.

187.    Britt Reynolds, HMA's CEO for Division 1 specifically instructed interim CEO Midkiff and Relator Metts that HMA was offering to joint venture Lancaster Regional specifically to attract the 100-plus PAL physicians in order to improve hospital operations through added referral volume.

188.    In fact, Reynolds specifically stated to interim CEO Midkiff and Relator Metts that the 100-plus PAL physician network was crucial to the development of referrals within the market.  Reynolds made it a priority for Midkiff to complete a joint venture that included Defendant PAL.  While Relator Metts was on a Division conference call, Reynolds relayed his belief that the Lancaster Regional joint venture would be successful with PAL's participation, and requested that a meeting with PAL be arranged for him (Reynolds).

189.    The Lancaster Regional joint venture was open to any physician in the area.  However, physicians who were not PAL members were expected to pay cash for their interest in the Lancaster Regional joint venture, at approximately $7,600 per share.   The non-PAL physician investors paid approximately $2.1 million in cash out of the total $8.36 million paid by joint venture physicians to HMA.

190.    The remaining $6.26 million investment in the Lancaster Regional joint venture was supposed to be paid by PAL physicians.

191.    From the outset, HMA understood that Defendant PAL physicians would not pay HMA cash for their $6.26 million interest in the Lancaster Regional syndication.  Instead, they would provide HMA with assets for their interest in the joint venture.

192.    Defendant Meyers conspired with Defendants HMA, PAL, and Warren by participating in negotiations with HMA and supporting Defendant PAL's demands in exchange for participation in the Lancaster Regional joint venture.

193.    In 2008, Defendant PAL also owned and operated an out-patient radiology center, Willow Street Imaging.  PAL's radiology center had been plagued by operating issues including: negative annual revenue; poor location; and aged or outdated equipment.

194.    In 2008, Defendant PAL also owned a 44% interest in a radiation center, Keystone Cancer Center.   The radiation center generated an estimated annual revenue of $410,000.

195.    Rather than pay cash for their interest in the joint venture, the Defendant PAL physicians transferred the following to HMA: 1) 100% ownership interest in PAL's Willow Street Imaging (the radiology center); 2) PAL's 44% interest in Keystone Cancer Center (the radiation center).

196.    At the time of the joint venture, Defendant PAL physicians and HMA were aware that PAL's Willow Street Imaging (*the radiology center*), was worthless.  For 2007 and 2008, the radiology center operated at a loss of $516,000 and $576,000, respectively.

197.    In addition, the radiology center had substandard MRI equipment.  The radiology center was also saddled with other aged inferior equipment, was heavily encumbered by leases on the equipment, and was facing heavy competition from newer radiology centers.

198.    HMA was aware that Defendant PAL's radiology center had little value.

199.    In order to support the exchange of PAL assets for the PAL physicians' interest in

the Lancaster Regional syndication, HMA inflated the value of PAL's *radiology* center. HMA obtained a valuation report to attempt to support this inflated value.

200.   Upon information and belief, HMA ascribed a value of $1.8 million to the radiology center and transferred to PAL a $1.8 million interest in the Lancaster Regional joint venture in exchange for the radiology center. When HMA purchased PAL's radiology center, HMA took on PAL's future lease obligations in addition to freeing PAL from the annual financial losses.

201.   At the time of the joint venture, the Keystone Cancer Center was owned by PAL and other partners. PAL owned a 44% interest: Defendant Wally Longton, M.D., and a minority partner (Keystone Cancer's Office Manager, Marc Moore) owned the remaining 56%. The radiation center was worth an estimated $5.6 million according to a valuation done by Defendant Wally Longton in early 2008. Based on this 2008 valuation, PAL's 44% interest was worth $2.46 million, and Defendant Longton and his partner owned $3.14 million interest.

202.   Therefore, the $6.23 million interest in the Lancaster Regional syndication that HMA transferred to the PAL physicians was significantly more valuable than the $4.26 million in assets HMA received from PAL: the Radiation Center ($2.46 million), plus Willow Street Radiology Center (based on an inflated value of $1.8 million).

203.   Upon information and belief, Dr. Longton may also have invested with a portion of his proceeds from the sale of the radiation center in the Lancaster Regional syndication, but this was separate from the PAL organization's investment of $6.23 million.

## PAL PHYSICIANS REQUESTED AND RECEIVED A $500K ANNUAL KICKBACK

204.   Well after HMA's joint venture presentations were made, Lancaster Regional's CEO Midkiff advised Relator Metts that Defendant PAL physicians would not participate in the Lancaster Regional joint venture unless HMA paid PAL $500,000 per year, in addition to other lucrative inducements HMA had offered.

205.   This discussion took place in the late summer of 2009, between Lancaster Regional's interim CEO Midkiff, its Chief Medical Officer ("CMO") Tony Mastropietro, and Relator Metts, Lancaster Regional's CFO.

206.   Steve Midkiff had been a Division CEO, but was named interim CEO of Lancaster Regional following Newsome's arrival in September 2008.   He was ultimately renamed a Division CEO at the end of 2009, after both the Heart of Lancaster and Lancaster Regional joint ventures were completed.

207.   When Midkiff discussed Defendant PAL's $500,000 demand, he and CMO Mastropietro (a non-PAL investor in the Lancaster Regional syndication) both expressed displeasure with Defendant PAL's last-minute demand because it delayed the completion of the Lancaster Regional joint venture.

208.   Midkiff also advised Metts that HMA's CEO Gary Newsome was comfortable using so called "co-management agreements."   HMA decided to move forward with the Lancaster Regional joint venture and provide the additional $500,000 to Defendant PAL through its use of a sham co-management agreement.

209.   Midkiff also told Relator Metts that Newsome had communicated to Midkiff that

he (Newsome) was comfortable with creating "co-management agreements" as he (Newsome) had utilized this approach in the past to work with physicians.

210.   To HMA, co-management agreements were additional vehicles to provide referring physicians with excessive compensation.

211.   In a follow-up conversation between Midkiff and Metts, who was also the Compliance Officer at Lancaster Regional, Metts compared the number of physician hospitalists (internists or other physicians who could provide full-time physician coverage at a hospital) that the hospital would have to employ to justify the $500,000 payment.   Metts calculated that Defendant PAL would have to expend the equivalent of 2.5 full-time employee physicians in order to earn the $500,000 annual payment PAL demanded.

212.   Metts asked Midkiff how HMA could possibly justify the $500,000 from a compliance standpoint.

213.   Although Midkiff recognized the difficulty in establishing the consideration PAL would have to provide HMA in order to make the $500,000 annual co-management arrangement compliant, he did not provide Metts with a response to Metts' concerns.

214.   In another conversation, Relator Miller spoke with Lancaster Regional's interim CEO, Midkiff, who confirmed to Miller the centrality of Defendant PAL's participation in the Lancaster Regional joint venture.   Midkiff added that the PAL group was holding out for a $500,000 annual directorship or co-management agreement.

215.   HMA knew that paying Defendant PAL physicians $500,000 each year to participate in the Lancaster Regional joint venture would constitute an illegal kickback.

## HMA DISGUISES $500,000 ILLEGAL KICKBACK
## AS "CO-MANAGEMENT" SERVICES

216.   In or about August or September 2009, a meeting was held between HMA
executives and Defendant PAL representatives to discuss how HMA would justify the fair
market value of services the PAL physicians could provide under the co-management agreement.

217.   Upon information and belief, HMA retained the services of a consultant to paper
over services the PAL physicians could perform to earn the co-management or service fee and to
create the co-management agreement.

218.   Upon information and belief, neither HMA executives nor Defendant PAL
intended that these alleged co-management services would actually be performed.

219.   Midkiff did not provide Metts with a response to Metts' inquiry regarding how the
co-management services would be documented.

220.   Upon information and belief, neither HMA nor Defendant PAL intended or
expected that PAL would substantially perform the co-management services.

221.   Upon information and belief, Lancaster Regional's interim CEO, Steve Midkiff
and HMA's Division 1 CFO, Chris Hilton, completed the Lancaster Regional co-management
agreement between the hospital and Defendant PAL after Relator Metts left HMA.

222.   On or about October 1, 2009, HMA consummated the Lancaster Regional joint
venture, transferred 11% of the hospital's stock to the 135 joint venture physicians (100 of whom
were PAL physicians) and began paying the PAL physicians $500,000 through a bogus "co-
management agreement."

223.   HMA initiated joint ventures for both of its Lancaster, PA facilities (Heart and

Regional) to lock in local physicians' referrals. These referral relationships were key to HMA's efforts to compete with the larger Lancaster General Health System.  Lancaster General's facilities included Lancaster General Hospital (590 beds), Lancaster General Women & Babies Hospital (79 beds), and Lancaster Rehabilitation Hospital (60 beds).

224.   HMA's efforts to acquire Lancaster OB/GYN and its willingness to pay the practitioners (including Drs. Kegel and Martini) exorbitant salaries are directly related to its goal to lure obstetrics and gynecology referrals away from Lancaster General Women & Babies Hospital.

225.   On at least a monthly basis, HMA tracked each local physician's referrals to HMA facilities.  This was done on an individual physician basis and by physician groups.

226.   Moreover, HMA also tracked so called "split admitters."  A split admitter was a physician whom HMA concluded had "split" their patient referrals between HMA facilities and local competitor hospitals.

227.   HMA utilized a creative way to track split admitters in their local market.  HMA estimated the size of the physician's total gross practice, then determined what portion of those patients were admitted into HMA facilities.  HMA could then estimate those patients whom were referred to a competitor.

**6.      HMA's Kickback Scheme – Joint Venture HMA Facilities Across HMA's Network to Lure Referrals from Competing Facilities**

228.   As stated above, HMA's Peter Lawson provided Relator Metts with a model HMA PowerPoint to use as a template for the Heart of Lancaster joint venture PowerPoint presentation.

229.   Upon information and belief, this standard HMA joint venture presentation was

prepared for another HMA facility, Davis Regional Medical Center, which is located in Statesville, North Carolina.

230.   According to the model PowerPoint for Davis Regional, which Lawson provided to Relator Metts, HMA's joint venture efforts already involved the following joint venture projects which were either completed or in progress:  1) four joint ventures of HMA hospitals were completed and an additional 21 were in progress; 2) three ambulatory surgery centers (ASC) had been joint ventured and an additional six ASC joint ventures were pending; 3) two joint ventures of hospital systems involving eight hospitals had been completed.

        a.      **HMA's Joint Venture of Davis Regional Medical Center in Statesville, North Carolina**

231.   Peter Lawson provided Relators with the HMA model PowerPoint to prepare the Heart of Lancaster PowerPoint.  This model presentation, originally used for the Davis Regional joint venture presentation, provides the framework and modus operandi for HMA's hospital joint ventures.

232.   The Davis Regional facility is a 149-licensed bed facility with 410 employees. HMA acquired Davis Regional on October 1, 2000.

233.   Davis Regional's "care service lines" include:  a 12-bed emergency department with 25,000 visits annually; an eight-bed ICU; a 30-bed telemetry unit; surgical services through four operating suites and a post-anesthesia care unit, 16 in-patient mental health unit beds; a 13-bed TCU; wound care with two hyperbaric chambers; and a two-patient dialysis unit.

234.   HMA's stated purposes for the Davis Regional joint venture included:  improved quality and risk management; and increased physician involvement; a return on investment to all

- 44 -

investors; increased efficiency and aligned interests of investors.

235.    In the Davis Regional PowerPoint, HMA listed its partnership experience through joint ventures of hospitals, ambulatory surgical centers and hospital systems.

236.    The Davis Regional PowerPoint also demonstrates that average physician ownership in HMA joint-ventured facilities is 10%.

237.    HMA proclaimed in the Davis Regional PowerPoint presentation that the joint venture proposed was compliant with the Anti-Kickback Statute (through the Investment Interest Safe Harbor) and with the Stark Law.

238.    The Davis Regional joint venture legal structure illustrates the format adopted in all HMA joint ventures:  a limited liability company (LLC) is formed to own the facility; a medical advisory group of 10 physicians who "advise [the] partnership on strategy and operations;" a board of directors makes "major balance sheet decisions;" and the continued governance of the existing medical staff and community board.

239.    The Davis Regional joint venture was structured to provide for the joint venture to purchase and assume leases of all the facility assets, but for the facility to be managed through an agreement between joint-ventured physicians and HMA, Inc.

240.    HMA also touted the "liquidity and cash management" aspects of the joint venture:  transfer of units; annual Davis Regional selling rights; and triggering events.

241.    At the time of the joint venture, HMA ascribed a "wholesale hospital value" to the Davis Regional facility of $67 million.  To this "wholesale" hospital value, HMA applied two discounts to arrive at an under-market "initial offering price" of $50 million:  1) a 20%

marketability discount; 2) a 5% control discount.

242.   These discounts were inappropriately applied because:  first, HMA would not have offered these discounts to a buyer who was not capable of referring patients to the hospital; and, second, HMA's investors can liquidate their interests based on fair market value.

243.   HMA's low discounted value of $50 million for Davis Regional confirms HMA's goal of undervaluing the facility in order to attract physicians, who are potential referral sources, to buy into the joint venture.

244.   The minimum total physician investment HMA required for the Davis Regional joint venture was 10% (1,000 units at 5,000 per unit), for a total physician investment of $5,000,000.

245.   One of the key tactics HMA uses to attract targeted joint referring physicians to their joint ventures is the "projected volumes" data.  For example, the projected increased volume of admissions for Davis Regional from 2008 to 2009, that HMA expected following the joint venture, was two admissions per day (from 14-16 admissions daily).  A very modest increase in the number of admissions at Davis Regional, according to HMA, would result in large returns for physician investors.

246.   The targeted physicians in attendance at the Davis Regional joint venture presentation would appreciate that a projected post-joint venture increase of only two admissions per day was very conservative, and that the actual increases would easily meet or exceed HMA's projections in light of the number of physicians targeted to participate in the joint venture.

247.   HMA's estimated ROI performance for Davis Regional, based on this

conservative projected increase in admissions (two admissions per day or 730 admission per year), was 20.2% average annual cash ROI.

248.   The physicians attending the Davis Regional PowerPoint presentation would be induced by the modest incremental increase in admissions (two per day) to provide them with a 20% annual ROI.

249.   HMA also provided the physicians attending the Davis Regional PowerPoint presentation with an astounding potential average return on their investment of 38% per year after five years.

250.   Interestingly, the 38% annual ROI HMA presented to the Davis Regional physicians is based upon the potential cash return to a joint venture investor who purchases 10 units for $50,000.  HMA calculates that after five years, the fair market value of the 10 units would be $94,319.  HMA also projected a 20% annual cash ROI ($50,000 in cash flow projected in the first five years).  Adding the fair market value of the investment ($94,319) and the cash ROI ($50,000) would yield a $144,892 total cash return to the joint venture physician over five years based on an initial investment of $50,000.

251.   HMA's illustration of the potential ROI in the Davis Regional joint venture presentation reveals a significant AKS compliance flaw in HMA's nationwide joint venture model.  HMA induces targeted referral sources to participate in the joint ventures through deeply discounted prices.  HMA presents physicians with robust projected ROIs and knows that the physician investors can transfer their interests based on the "fair market value of the investment." HMA entices the joint venture physicians with the opportunity to receive a disproportionate

return on their investment.

       **b.**       **HMA's Lebanon Tennessee Joint Venture**

252.    As stated above, before October 2008, HMA Division 1 CEO Finnegan provided Relator Miller with a word document to use as a template when drafting a proposal to joint venture Heart of Lancaster. This HMA template for a joint venture proposal involved a HMA facility in Lebanon, Tennessee, a suburb of Nashville.

253.    HMA's Lebanon, Tennessee hospital, referred to as "University Medical Center" ("UMC") at the time, was a 254-bed, two-campus acute health facility with 800 full and part-time employees, which is also the sole health care services provider in Wilson County, Tennessee.

254.    HMA's joint venture proposal document for the Lebanon, Tennessee, facility (UMC) provided that UMC had to complete its joint venture by July 2009 and failure to do so "will irreparably damage physician relationships and UMC's reputation with the State of Tennessee Health Services Development Agency."

### HMA UNDERVALUED ITS LEBANON TENNESSEE FACILITY TO INDUCE REFERRALS FROM "SPLIT ADMITTERS"

255.    HMA offered the Lebanon, Tennessee, joint venture physicians a minimum 10% share of the Lebanon, Tennessee's $80 million discounted price, for $8 million, based on a total of 10,000 ownership units, at $8,000 per unit.

256.    Upon information and belief, HMA intentionally undervalued the Lebanon, Tennessee, facility in order to attract targeted joint venture physicians to participate in the scheme.

- 48 -

257.    HMA highlighted the following benefits of the Lebanon, Tennessee (UMC) joint venture:  1) similar transactions between local physicians and HMA facilities have shown that when "physician and hospital incentives are aligned, volume increases;" and  2) the joint venture will provide the HMA hospital with "the opportunity to gain greater market share and referrals from split admitters and physicians that have referred elsewhere in the past if they have an ownership in the newly formed LLC."

258.    "Split admitters" is a term of art which refers to physicians who "split" their admissions (referrals) between two or more hospitals.

259.    HMA's internal document for the Lebanon, Tennessee, joint venture reveals that HMA intended for joint venture physicians to refer patients to the joint venture hospital and that other HMA joint ventures had led to increased referrals and market shares for HMA.

260.    HMA also recognized the following risks from the Lebanon, Tennessee, joint venture:  1) projections were based on physician "support" for the joint venture, including the support of physicians on staff; 2) although HMA expected "significant increases in volume from physician investors in secondary markets," UMC margins could be diluted if these physicians are passive investors; and 3) if HMA did not joint venture with the UMC area surgeons, a competitor could build an ambulatory surgery center and joint venture with the surgeons, causing referral patterns to form between area surgeons and non-HMA facilities.

261.    HMA's targeted primary care and surgical service physicians for the Lebanon, Tennessee, joint venture.

262.    HMA's Lebanon, Tennessee, joint venture proposal included projections for

annual expected cash return on investment (ROI) of 20.9% to 25.2% to the participating physicians over five years.

263.    HMA clearly expected that joint venture physicians would be "loyal" to the joint venture and "shift" referrals to the joint venture hospital.  HMA estimated increased revenues from additional volume (admissions and surgeries) following the Lebanon, Tennessee, joint venture.  HMA based these "volume projections...upon increased loyalty from primary care and surgical service physicians that are currently either full or part-time with [HMA's] nearest competitor... and that physician investors are expected to shift referral patterns to the hospital."

        **c.**     **HMA Joint Ventures in Alabama, West Virginia and Georgia**

264.    HMA's PowerPoints illustrate that HMA knew that joint ventures were profitable and that HMA communicated robust ROIs to targeted physicians.

265.    The model PowerPoint for HMA's North Carolina facility (Davis Regional) also included cash flow and ROI figures for two other joint-ventured HMA facilities, one in Alabama and another in West Virginia.  The Davis Regional PowerPoint also provided physician investment examples from joint ventures in Georgia in addition to West Virginia and Alabama.

266.    According to HMA's Davis Regional presentation, the daily patient census at the Alabama joint ventured facility increased from 72 in 2006 (pre-joint venture) to 94 in 2008 (post-joint venture), an increase of 31%.  HMA touted a similar increase in patient census of 26% post-joint venture for its West Virginia facility.

267.    HMA also used the Alabama joint-ventured facility's cash-flow performance to provide the Davis Regional joint venture physicians with a sense of their potential ROI.

- 50 -

According to HMA, cash flows at the Alabama facility doubled from $7.49 million in 2006 to $14.6 million in 2008. In the same years, the physician investors' ROI also doubled from 10% to 20%.

268.    Upon information and belief, HMA's Alabama, Georgia and West Virginia joint ventures involved similar schemes to those applied in Pennsylvania, Tennessee and North Carolina: HMA's offer of a discounted HMA facility to joint venture physicians to induce their participation in the joint venture; the acceptance by the targeted physicians of the joint venture opportunity; HMA's linkage of increased referrals by physician investors and attractive ROIs.

**B.      Defendants Concealed Excessive Compensation Deals with Physicians to Induce Referrals to HMA's Hospitals in Violation of the Anti-Kickback Statute and Stark Laws**

**1.      HMA and Heart of Lancaster Agreed to Acquire OB/GYN of Lancaster and to Pay its Principals (Drs. Kegel and Martini) Exorbitant Salaries in Exchange for the Physicians' Referrals and Concealed Excessive Remuneration through Bogus Co-Management Agreements**

269.    While present at HMA offices prior to his June 1, 2008 start date, Relator Miller attended a meeting in May of 2008 to discuss details of Heart of Lancaster's physician practices. Miller learned that HMA had implemented a plan to acquire an OB/GYN practice in order to increase deliveries and surgical admissions. HMA's efforts were aimed at recouping a massive investment HMA had made to outfit Heart of Lancaster with a state-of-the-art birthing center.

270.    Relator Miller learned that HMA sought to acquire the practice of a robust obstetrics/gynecology practice, OB/GYN of Lancaster, which included ten obstetricians and gynecologists, and seven certified nurse midwives (CNWs).

271.    Within a few weeks of arriving at Heart of Lancaster, Relator Miller learned that

- 51 -

his predecessor CEO of Heart of Lancaster and Lancaster Regional, Michael Cowling, had agreed to pay the principals of OB/GYN of Lancaster excessive salaries in order to secure their patient referrals.

272.    Cowling's offer to the two principal physicians at OB/GYN of Lancaster (Drs. Kagel and Martini) included an annual salary (for each physician) of $450,000, for 5 years, without reduction.  Upon information and belief, at the time of Heart of Lancaster's offer, each doctor was earning $225,000 yearly.

273.    The MGMA, a membership association of professional medical administrators and leaders of medical group practices, provides a variety of services to its members, including an annual survey of salaries for medical professionals around the country. Defendant HMA used these salary guidelines in determining the fair market value of salaries for its employed physicians and those physicians whose practices HMA sought to acquire.

274.    HMA policy provided that a hospital CEO could approve proposed employee salaries only in the 50th to 75th percentile of Medical Group Management Association ("MGMA") salary guidelines.

275.    According to MGMA guidelines, a salary of $360,000 annually would place an OB/GYN above the 90th percentile for compensation compared to other OB/GYNs across the country, including major metropolitan areas such as New York City.   An annual salary of $450,000 far exceeds MGMA guidelines for OB/GYNs.

276.    In 2008, Stan Mc Lemore, HMA Senior Vice President – Financial Operations, was charged with approving physician contracts (both new agreements and renewals) at the

corporate level.

277.   Relator Miller learned that Stan Mc Lemore would not approve Heart of Lancaster's offer to pay the Lancaster OB/GYN principals $450,000 each.

### HMA TRIED TO RESTRUCTURE THE OB/GYN'S DEAL TO DISGUISE THE EXCESSIVE KICKBACKS TO KAGEL AND MARTINI AS A MEDICAL DIRECTORSHIP AND A SIGN-ON BONUS

278.   In July or August of 2008, Jay Finnegan and Doug Browning had instructed Miller to approach Kagel and Martini and offer them a base salary of $375,000, a $50,000 medical directorship, and a $25,000 sign-on bonus. This change was made to bring the physicians' base salary component of their total compensation package closer to the MGMA guidelines of $360,000 for obstetricians and $300,000 for gynecologists.

279.   Through this revised offer, HMA would have paid Drs. Kagel and Martini each a total compensation of $450,000 in the first year and $425,000 in the subsequent four years.

280.   When Relator Miller approached Dr. Kagel with the revised HMA offer, the latter balked and replied that he and Martini would not leave their current practice to join HMA's Heart of Lancaster unless they were provided the terms offered by Heart of Lancaster's previous CEO, Cowling.

### HMA ULTIMATELY HID EXCESSIVE COMPENSATION FOR OB/GYNS THROUGH BOGUS CO-MANAGEMENT AGREEMENTS

281.   Ultimately, HMA CEO Newsome did approve Heart of Lancaster's offer to pay the Lancaster OB/GYNs $450,000 each in an effort to secure the lucrative OB/GYN business.

282.   From October 2008 until his departure in May 2009, Relator Miller repeatedly received directives from HMA's executives, specifically CEO Newsome, to "get the deal [with

- 53 -

Drs. Kagel and Martini] done."

283.    During the October 2008 meeting on Heart of Lancaster's budget for 2009, HMA's CEO Newsome directed Relator Miller to "get the deal done" and pay the OB/GYNs' salaries over 100% of MGMA standards.  This meeting was also attended by HMA's COO Kelly Curry, Division 1 President Jay Finnegan, Heart of Lancaster and Lancaster Regional CFO (Relator Metts), and Deborah Willworth, COO for Heart of Lancaster and Lancaster Regional.

284.    Newsome repeated his message to Relator Miller to "get the deal done" several times.  For example, in November 2008, while Newsome was attending a meeting at Lancaster Regional, and in the presence of Relator Metts and Jay Finnegan, Newsome specifically asked Relator Miller if the Lancaster OB/GYN deal was complete.

285.    During the same budget meeting, HMA COO Kelly Curry also directed Jay Finnegan to go to Heart of Lancaster and to stay until the deal with Lancaster OB/GYN was done.

286.    In November or December 2008, HMA's executive in charge of physician services, Mike Gingrich (Mc Lemore's successor), told Relator Miller that he (Gingrich) had refused to authorize the Kagel and Martini contracts because the proposed annual compensation of $450,000 per physician far exceeded the MGMA guidelines and that HMA's CEO, Newsome (who took over in September 2008), would have to approve the deal.

**HMA OFFERS LUCRATIVE SERVICES AGREEMENTS
WHEN CO-MANAGEMENT DEALS COULD NOT BE USED
TO HIDE KICKBACKS TO DRS. KAGEL AND MARTINI**

287.    After Kagel and Martini rejected the $375,000 salary offer, Relator Miller

- 54 -

received approval from HMA to give the Lancaster OB/GYN principals a "co-management agreement" to achieve a $450,000 per annum salary.

288.    The co-management agreement was intended to create the appearance of keeping the OB/GYNS' compensation rate within MGMA thresholds.  Relator Miller was also told to use an outside consultant to ascribe a value to the co-management services.

289.    HMA engaged Healthcare Appraisers to create documentation to identify co-management services the OB/GYN physicians could provide and to ascribe a value to these services in order to attempt to justify the excessive salaries HMA paid to the two principal physicians.  Healthcare Appraisers provided their final valuation report to HMA on April 21, 2009.

290.    Healthcare Appraisers arrived at a range of $267,000 to $350,000 for the fair market value for the total management fee to be paid for the OB/GYN co-management services which Drs. Kagel and Martini could provide to HMA's Heart of Lancaster.  Healthcare Appraisers specified that this included both the base and incentive management fees, and that the base management fee should be no more than 60% and no less than 40% of the total management fee.  This would entitle Drs. Kagel and Martini to a combined base management fee between $106,000 (40% of $267,000) and $210,000 (60% of $350,000).

291.    On November 16, 2009, eight months after HMA received Healthcare Appraisers' report, HMA listed these doctors' base salaries at $425,000 each, which included co-management fees of $160,000 for Dr. Kagel and $90,000 for Dr. Martini (for a total of $240,000 in co-management agreement fees).  This $240,000 exceeds the fair market value of services

included in the co-management arrangement base management fee, which Healthcare Appraisers capped at $210,000.

292.   The Healthcare Appraisers' report listed the services contemplated by the base management fee, which Healthcare Appraisers estimated would take 1,447 hours, roughly the equivalent to one part-time (.77 FTE) medical director.

293.   Drs. Kagel and Martini could earn the incentive portion of the total management fee (anything in excess of $210,000 for combined OB/GYN management services) only if they met the "Quality Incentive Metrics."   The first of these "incentives" is related to meeting a certain "volume of vaginal and caesarean section … deliveries."

294.   HMA's payment of $240,000 in co-management fees to these referring physicians (in addition to their exorbitant salaries) exceeds the fair value that Healthcare Appraisers document was supposed to support, but also establishes that the co-management fees paid by HMA were based, at least in part, on the volume or value of the doctors' referrals.

295.   Thereafter, HMA fashioned new offers for Drs. Kagel and Martini.  HMA offered Dr. Kagel a compensation package which included:  (a) an employment contract providing for a salary of $360,000 as an OB/GYN; (b) an additional $90,000 to be paid under the guise of a co-management agreement; and (c) a five-year term without reduction.  HMA offered Dr. Martini, who performs solely GYN surgery, the following package:  (a) a $300,000 base salary; (b) a $150,000 co-management agreement; and (c) a five-year term without reduction.  In addition, HMA gave each physician a fully-funded 401(k) retirement worth in excess of $25,000 per year.

296.   When Relator Miller left HMA in May 2009, the terms of Drs. Kegel's and

Martini's written co-management agreements were not finalized. However, Relator understands that, essentially, HMA created documents to support the illusion that, in exchange for $90,000 and $150,000 in additional compensation, Drs. Kagel and Martini would perform bona fide services for Heart of Lancaster.

297. Relator learned that HMA offered Dr. Kagel a $360,000 annual salary, plus a $90,000 annual "services agreement" related to alleged oversight duties for OB and high-risk OB. Relator also learned that HMA had agreed to pay Dr. Martini a $300,000 annual salary plus a $150,000 annual "services agreement" related to oversight of GYN surgery. Both physicians received five-year contracts.

298. In order to pay Drs. Kagel and Martini twice their pre-HMA salaries, HMA paid each physician significant kickbacks through its now well-honed "co-management" or "services" agreement, in spite of HMA's knowledge from their co-management consultant, Healthcare Appraisers, that neither vehicle could appropriately be used to compensate salaried employees.

## HMA EXECUTIVES AGREED TO PAY $1 MILLION IN KICKBACKS TO LANCASTER OB/GYN IN EXCHANGE FOR $3 MILLION IN REFERRALS

299. From September 2008, after the arrival of HMA's new executive team, headed by Newsome, and the restructuring of Division 1, Vice President Britt Reynolds had direct oversight of Heart of Lancaster.

300. On the day Relator Miller was terminated, in May 2009, he was updating Britt Reynolds on key projects (it was normal to provide periodic updates). When discussing the Lancaster OB/GYN contract, Reynolds told Miller that he (Reynolds) had discussed the issue of excessive salaries for the principals of OB/GYN of Lancaster with Newsome.

301.    A September 2008 profit and loss prepared by Relator Metts calculated that post-acquisition, Heart of Lancaster would incur an additional $1.1 million in incremental losses related to Lancaster OB/GYN physician and midwives' salaries.

302.    Relator Miller recalls that HMA calculated that Drs. Kagel and Martini's practice would bring 80 new obstetric patients for deliveries, plus an additional 92 gynecological surgeries per month to Heart of Lancaster.  HMA estimated that these referrals would provide approximately $3 million annually in additional revenues.

303.    Reynolds told Miller that Newsome had specifically approved the purchase of the Lancaster OB/GYN practice and payment of excessive salaries, saying: "I'll trade $1 million [in additional salaries for the doctors] for $3 million in EBDITA [profit] any time."

304.    EBDITA refers to earnings before depreciation, interest, taxes and amortization, and is generally analogous to a hospital's operating profit from operations.

305.    It was this $1 million incremental loss and the corresponding estimated $3 million in added revenues related to the Lancaster OB/GYN deal that Miller understood HMA's Britt Reynolds was referring to on the day Miller was terminated.  (As recited above, Reynolds had quoted CEO Newsome as having said he would pay $1 million in salary for $3 million in profit.)

306.    Upon information and belief, HMA's Heart of Lancaster acquired Drs. Kagel and Martini's practice after Relator Miller's employment with HMA ended.

307.    Upon information and belief, HMA has a policy of paying excessive salaries to targeted potential referral sources.

308.    Upon information and belief, another principal physician in Lancaster OB/GYN

(Dr. Fromuth) also received an employment agreement from HMA and an annual salary of $300,000, which was guaranteed for five years. Prior to going to Heart of Lancaster, Fromuth had earned $225,000 annually.

309.    The remaining full-time OB/GYN physicians in the Kagel/Martini practice each received HMA offers for salaries in the $240,000 range for two years. Upon information and belief, all of the Lancaster OB/GYNs received significant raises from HMA.

310.    Upon information and belief, HMA also paid Lancaster OB/GYN, as a practice, (over and above the services agreement fees paid to Kagel and Martini) separate co-management agreement fees of $240,000.

311.    Upon information and belief, HMA also provided each of the Lancaster OB/GYN physicians with a funded 401(k) retirement plan worth approximately $25,000 annually to each physician.

312.    The compensation relationships between HMA and Lancaster OB/GYN physicians do not meet either the Anti-Kickback safe harbors or an exception to the Stark Law.

**2.    Heart of Lancaster Pays General Surgeon $1.2 Million in Recognition of the Volume of Referrals Brought to the Hospital**

313.    When Miller began his employment, HMA's Heart of Lancaster had a contract in place which paid Defendant, Glenn Kline, D.O., a general surgeon, in excess of $1 million annually.

314.    Defendant. Kline was an employed physician whose salary was based on the volume of business he brought to Heart of Lancaster.

315.    In 2008, for example, Defendant, Kline's patients accounted for 50% of Heart of

Lancaster's surgical business.  In recognition of Dr. Kline's referrals, HMA's Heart of Lancaster had agreed to pay Defendant Kline, under a three-year contract, 68% of net cash collections related to his patients.  This means that Dr. Kline received 68% of cash HMA collected from the patients Dr. Kline saw in his clinic.

316.   The compensation HMA paid to Defendant Kline was not reduced for the losses associated with Dr. Kline's surgical clinic.  Rather, HMA absorbed these losses.

317.   In 2008, HMA paid Dr. Kline $1.2 million and HMA also absorbed $250,000 in losses related to his practice, in recognition of Defendant Kline's ability to refer patients to Heart of Lancaster.  Under MGMA guidelines, the median annual compensation for a general surgeon is $360,115, and the median compensation a percentage of cash receipts is 54%.

318.   This arrangement was illegal because HMA paid Defendant Kline an excessive salary plus absorbed $250,000 in losses on his practice.  HMA did this, at least in part, in recognition of Dr. Kline's ability to refer patients to Heart of Lancaster and/or to induce him to refer patients to HMA in the future.

319.   The salary paid to Defendant Kline does not fit within any employment safe harbor to the Anti-Kickback Statute because Dr. Kline's compensation is not based on fair market value

320.   HMA does not have a bona fide employment relationship with Dr. Kline where HMA is both paying excessive compensation to Dr. Kline and losing $250,000 annually by virtue of the employment agreement with Dr. Kline.  Executives at the highest levels at HMA were aware of this illegal arrangement.

- 60 -

321.   After learning that Heart of Lancaster made the 5-year deal with Defendant Lancaster OB/GYN physicians, and that Lancaster Regional Hospital had made a 5-year deal with another general surgeon, Defendant Kline approached Heart of Lancaster's then CEO, Relator Miller, and requested a new 5-year contract.  Defendant Kline wanted 68% of his then current compensation (68% of $1.2 million or $816,000 annually), plus an incentive.  Defendant Kline also requested that Heart of Lancaster pay his medical malpractice insurance ($55,000 annually), which Kline had been responsible for paying.

322.   Upon information and belief, Heart of Lancaster and Defendant. Kline reached a new agreement after Relator Miller's departure.  Under the new contract, Relators believe that HMA guaranteed Dr. Kline an annual base salary of $816,000, plus a lucrative percentage of net revenue in excess of $816,000.  In addition, HMA continued to absorb $250,000 in Dr. Kline's costs and also provided him with a lucrative funded 401(k) retirement benefit worth at least $25,000 annually. Upon information and belief, this was a 5-year deal.

323.   HMA offered Defendant Kline excessive remuneration through an attractive benefit package which included: 1) salary well above MGMA's guidelines;  2) HMA's payment of Dr. Kline's annual clinic losses of approximately $250,000; and 3) other benefits, including an incentive and retirement benefits.

324.   Defendant Kline's $816,000 guaranteed salary exceeded MGMA guidelines which listed compensation for a general surgeon at $306,000 to place the physician's pay at 50% of MGMA guidelines.

325.   Upon information and belief, this offer to Defendant Kline was approved by

HMA's Division 1 CEO, Britt Reynolds, and Heart of Lancaster's CEO, Karen Metz, in July or August 2009.

326.    The compensation relationship HMA formed with Defendant Kline does not meet any of the Stark exceptions.

### C.    Defendants Failed to Meet Medicare and Medicaid Conditions of Participation ("COPs")

327.    In order for services at any Defendant HMA's facilities, including Defendant Lancaster Regional and/or Heart of Lancaster, to qualify for coverage under any federal health care program, it must meet all Medicare conditions of participation (Medicare COPs), including compliance with the federal Anti-Kickback Statute. Defendants failed to meet these Medicare COPs because, as alleged herein, Defendants violated the federal Anti-Kickback Statute and Stark Laws.

328.    In order for Defendant HMA's services to qualify for coverage under state health care programs offered in Florida, Georgia or Tennessee, including Medicaid, HMA must meet all Medicaid conditions of participation (Medicaid COPs), including compliance with the federal Anti-Kickback Statute and Stark Laws. Defendants failed to meet these Medicaid COPs because, as alleged herein, Defendants violated the federal Anti-Kickback Statute, applicable state Anti-Kickback Statutes, and federal Stark Laws.

329.    In order for Defendants HMA's services to qualify for coverage under other state health care programs, including Medicaid, they must meet all Medicaid conditions of participation (Medicaid COPs), including compliance with the federal Anti-Kickback Statute. Defendant HMA failed to meet these Medicaid COPs because, as alleged herein, Defendant

HMA violated the federal Anti-Kickback Statute and Stark Laws.

330.   Defendants employed unlawful schemes to acquire future patient referrals by paying "kickbacks" to targeted physicians. The methods used to mask the kickbacks included joint ventures with referring physicians and payment of excessive compensation under the guise of "co-management" or "services" agreements (in some instances, for physician services which were not rendered).   These schemes and relationships with referring physicians violate the aforementioned federal Anti-Kickback Statute, state anti-kickback laws, and the Stark Laws.

331.   Defendants have violated the federal FCA by committing acts to further the submission of claims to federal health care programs for services related to patient referrals tainted by Defendant HMA's federal Anti-Kickback Statute violations.

332.   Defendants have violated the federal FCA by committing acts to further the submission of claims to federal and state health care programs for services related to patient referrals tainted by Stark Law violations.

## V.   BACKGROUND ON FEDERAL & STATE-FUNDED HEALTH INSURANCE PROGRAMS

### A.   Medicare Program

333.   In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

334.   Medicare now has three parts: Part A; Part B, and the recently enacted Part D

Program.

335.   Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care). Medicare Part A also helps cover hospice care and some home health care.

336.   Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care.  It also covers some other medical services that Part A doesn't cover (i.e., physical and occupational therapist services, etc.).  Part B helps pay for covered health services and supplies when they are medically necessary.

337.   Medicare Part D (Prescription Drug Plan) provides beneficiaries with assistance in paying for out-patient prescription drugs.

338.   Payments from the Medicare Program come from a trust fund – known as the Medicare Trust Fund – which is funded through payroll deductions taken from the work force, in addition to government contributions. Over the last forty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

339.   The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

340.   Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government (particularly CMS).

341.   Under Medicare Part A, contractors serve as "fiscal intermediaries," administering

Medicare in accordance with rules developed by the Health Care Financing Administration ("HCFA").

342.    Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers", are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

343.    Under Medicare Part D, Medicare beneficiaries must affirmatively enroll in one of many hundreds of Part D plans ("Part D Sponsors") offered by private companies that contract with the federal government.   Part D Sponsors are charged with and responsible for accepting Medicare Part D claims, determining coverage, and making payments from the Medicare Trust Fund.

344.    The principal function of both intermediaries and carriers is to make and audit payments for Medicare services to assure that federal funds are spent properly.

345.    To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent they are, medically necessary. Medicare will only reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific illness or injury.

**B.    <u>Medicaid Program</u>**

346.    Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act. The Medicaid program aids the states in furnishing medical

assistance to eligible needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

347.    Medicaid is a cooperative federal-state public assistance program which is administered by the states.

348.    Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program. Federal support for Medicaid is significant. For example, the federal government provides 50% of the funding for Georgia, Florida and Tennessee Medicaid, the remaining 50% of funds is received from the state.

349.    Title XIX of the Social Security Act allows considerable flexibility within the States' Medicaid plans and, therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

350.    However, in order to receive federal matching funds, a state Medicaid program must meet certain minimum coverage and eligibility standards. A state must provide Medicaid coverage to needy individuals and families in five broad groups: pregnant women; children and teenagers; seniors; people with disabilities; and people who are blind. In addition, the state Medicaid program must provide medical assistance for certain basic services, including inpatient and outpatient hospital services.

C.    **Other Federal Health Care Programs**

351.    In addition to Medicaid and Medicare, the federal government reimburses a portion of the cost of prescription drugs under several other federal health care programs, including but not limited to CHAMPUS/TRICARE, CHAMPVA and the Federal Employees

Health Benefit Program.

352.     CHAMPUS/TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veteran Affairs, is a health care program for the families of veterans with a 100 percent service-connected disability.  The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for hundreds of thousands of federal employees, retirees, and survivors.

353.     The complexity and financial magnitude of federal and state health care programs, including the Medicare and Medicaid programs, create the incentive and opportunity for pervasive fraud and abuse.

## VI.     APPLICABLE LAW

### A.     Federal Anti-Kickback Statute

354.     Enacted in 1972, the main purpose of the federal Anti-Kickback Statute, 42 U.S.C. §13207b(b), is to protect patients and federal health care programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions.

355.     When an entity pays kickbacks to a doctor in order to induce him/her to refer or recommend patients to the entity for goods and/or services, it fundamentally compromises the integrity of the doctor-patient relationship.  Government-funded healthcare programs, such as Medicare and Medicaid, rely upon physicians to decide what treatment is appropriate and medically necessary for patients, and, therefore, payable by that healthcare program.  As a

condition of its reimbursement, government healthcare programs require that the physicians must render their services without the conflict of receipt of a kickback.

356.    Many states, including those States identified as Plaintiffs herein, have enacted similar prohibitions against illegal inducements to health care decision-makers.

357.    The federal Anti-Kickback Statute and analogous state laws make it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person:

> (1)    to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or

> (2)    to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program.

42 U.S.C. § 1320a-7b(b)(1) and (2).

358.    The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind.  42 U.S.C. § 1320a-7b(b)(1).

359.    Violations of the federal Anti-Kickback Statute must be knowing and willful.  42 U.S.C. § 1320a-7b(b)(1).

360.    The federal Anti-Kickback Statute has been interpreted by the United States Court of Appeals for the Third Circuit, as well as other federal courts, to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals.

361.    Proof of an explicit *quid pro quo* is not required to show a violation of the Anti-Kickback Statute.

362.    A violation of the federal Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both.  Any party convicted under the federal Anti-Kickback Statute *must* be excluded (*i.e.*, not allowed to bill for any services rendered) from Federal health care programs for a term of at least five years.  42 U.S.C. § 1320a-7(a)(1).

363.    Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the federal Anti-Kickback Statute, the Secretary may exclude that provider from federal health care programs for a discretionary period, and may impose administrative sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7(b).

364.    HHS has published safe harbor regulations that define practices that are not subject to prosecution or sanctions under the federal Anti-Kickback Statute because such practices would unlikely result in fraud or abuse.  See 42 C.F.R. §1001.952.  However, only those arrangements that precisely meet all of the conditions set forth in the safe harbor are afforded safe harbor protection.  None of the practices at issue here meet these safe harbor regulations.

365.    Compliance with the Anti-Kickback Statute is a condition of payment under the Medicare and Medicaid programs, and that condition applies regardless of which entity is submitting the claim to the government.

366.    Claims that arise from a kickback scheme are false, and violate the False Claims Act, because they are the result of a kickback – no further express or implied false statement is required to render such infected claims false, and none can wash the claim clean.

- 69 -

367.   It is the very fact that the health care decision-maker has accepted a kickback that per se renders not payable the claims for goods or services as to which the kickback was given, not whether the decision-maker would have otherwise selected that good or service (here, services provided by HMA's joint-ventured facilities).

368.   Moreover, as a prerequisite to participating in federally-funded health care programs, providers must certify (expressly or, through their participation in a federally-funded health care program, impliedly) their compliance with the federal Anti-Kickback Statute.

369.   As a prerequisite to participating in the various state Medicaid programs, providers must certify (expressly or, through their participation in the state-funded health care program, impliedly) their understanding of and compliance with both the federal Anti-Kickback Statute and applicable state anti-kickback laws.

370.   Even in absence of an express certification of compliance, a party that submits a claim for payment impliedly certifies compliance with all conditions of payment, i.e., that it is properly payable.  Consequently, if a party pays a kickback to induce the referral of a patient for in-patient or out-patient services and related goods, it renders false the submitter's implied or express certification of compliance that the resulting claim meets with the requirements of the Anti-Kickback Statute.

**B.**     **The Stark Law**

371.   Section 1877 of the Social Security Act, 42 U.S.C. § 1395nn(a)(1), the Stark Law, prohibits a physician from referring Medicare patients for certain "Designated Health Services" ("DHS"), to an entity with which the physician or the physician's immediate family has a

"financial relationship," unless an exception applies.

372.    When originally enacted in 1989, the Stark Law prohibitions applied only to physicians' referrals for clinical laboratory services. <u>See</u>, Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.  In 1993 and 1994, Congress extended the Stark Law to referrals for ten additional DHS, including inpatient and outpatient hospital services.   <u>See</u>, Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562; Social Security Act Amendments of 1994, P.L. 103-432, § 152.

373.    The Stark Law prohibits physician referrals to related entities for inpatient and outpatient hospital services.

374.    The Stark Law's prohibitions center on the connection between the referring physician and the entity receiving the referral.   The term "financial relationship" includes indirect compensation arrangements between the physician and an entity that furnishes DHS. <u>See</u>, 42 C.F.R. § 411.354(a)(1)(ii).

375.    The Stark Law broadly defines "financial relationship" to include ownership and investment interest and compensation agreements that involve any direct or indirect remuneration between a physician and an entity providing DHS.  The Stark Law's exceptions identify specific types of investments and compensation agreements that will not violate its referral and billing prohibitions.

376.    For example, compensation paid to a referring physician serving as an employee in a hospital will fall within an exception to the statute if: (1) the employment is for readily identifiable services; (2) the amount of remuneration paid to the physician is consistent with the

- 71 -

fair market value of the services provided and is not "determined in a manner that takes into account directly or indirectly the volume or value of any "referrals" by the physician; and (3) the compensation to the physician would be "commercially reasonable" in the absence of any referrals by the physician.  42 U.S.C. § 1395nn(e)(2).

377.   Thus, compensation paid to a physician under an employment agreement that exceeds fair market value, for which no actual services are performed, or which takes into account the volume or value of the referrals or other business generated between the parties, triggers the referral and payment prohibitions of the Stark Law with respect to DHS referred by that physician.

378.   In addition to prohibiting certain physician referrals, the Stark Law prohibits health care entities from presenting or causing to be presented any Medicare claim for DHS provided as a result of a prohibited referral.  See, 42 U.S.C. § 1395nn(a)(1)(B).  Any entity that collects Medicare payments for DHS rendered pursuant to a prohibited referral must refund all collected amounts.  42 U.S.C. § 1395nn(g)(2); 42 C.F.R. § 411.353(d).

379.   Violations of the Stark Law may subject the physician to exclusion from participation in federal health care programs and various financial penalties, including: (1) a civil monetary penalty of $15,000 for each service included in a claim for which the physician knew or should have known that payment should not have been made under Section 1395nn(g)(1); and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the physician knew or should have known was prohibited.  See, 42 U.S.C. §§ 1395nn(g)(3) , 1320a-7a(a).

380.    Stark Law violators on both sides of the illegal referral relationship are subject to the sanctions, which include denial of payments, refund of claims, and civil monetary penalties of up to $15,000 per DHS based on an improper referral.  42 U.S.C. § 1395nn(g).

C.    **The Federal False Claims Act**

381.    The federal False Claim Act (federal FCA) provides, in pertinent part:

(a)    Any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspires to commit a violation of (1) or (2) is liable to the United States Government for  a civil penalty of not less than $5,500 and  not  more  than  $11,000,  plus  three  times  the  amount  of  damages  which  the Government sustains because of the act of that person.   31 U.S.C. § 3729(a)(1)(A), (B), (C) and (G).

(b)    For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.  31 U.S.C. § 3729(b)(1).

### COUNT I  (ALL DEFENDANTS)
### VIOLATIONS OF THE FEDERAL ANTI-KICKBACK STATUTE
### 42 U.S.C. § 1320a-7b(b)

382.    Relators re-allege ¶¶ 1-381 as though fully set forth herein.

383.    Defendant HMA's joint ventures constitute arrangements that violate the federal

Anti-Kickback Statute because HMA transferred an ownership interest in HMA's facilities, including, but not limited to, Lancaster Regional and Heart of Lancaster, for less than fair market value. HMA provided an inducement to the joint venture physicians, one purpose of which was to encourage referrals to HMA facilities.

384.   Defendant HMA knowingly made excessive payments to physician participants (including Defendants PAL, Warren, and Longton) in its various joint ventures as financial inducement for patient referrals to HMA facilities, including Defendant Lancaster Regional and to Defendant Heart of Lancaster, which services were paid for by federal programs, including Medicare and Medicaid, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

385.   Defendant HMA provided illegal kickbacks to scores of physicians, including Drs. Kegel, Martini, and Kline, through compensation far in excess of fair market value, to induce improper referrals of services provided to beneficiaries of federally-funded healthcare programs.

386.   Defendant HMA's co-management arrangements are not protected under the existing AKS "safe harbor" regulations.

387.   Since at least 2007, Defendant HMA has paid millions of dollars in estimated kickbacks to more than 100 physicians who participated in joint ventures or received bogus co-management agreements.

388.   For each of these federal Anti-Kickback Statute violations, Defendants are subject to penalties of up to $50,000 for each improper act, plus damages of up to three times the amount of the improper remuneration at issue. 42 U.S.C. § 1320a-7a(a).

WHEREFORE, Relators request the following relief:

A.      Judgment against the Defendants in an amount equal to up to three times the amount of the improper remuneration at issue;

B.      Imposition of penalties of up to $50,000 for each kickback violation;

C.      Their attorneys' fees, litigation and investigation costs, and expenses;

D.      Such other relief as the Court deems just and appropriate.

## COUNT II  (ALL DEFENDANTS)
## VIOLATIONS OF THE STARK LAW
## 42 U.S.C. § 1395nn

389.   Relators re-allege ¶¶ 1-388 as though fully set forth herein.

390.   Defendant HMA had financial relationships with the PAL physicians, including, but not limited to Defendants Warren, Longton, as well as with Drs. Kegel and Martini, and Defendant Kline, and with the physician employees who received excessive compensation to which the Stark Law applied, by virtue of the illegal, excessive remuneration that Defendant HMA paid to these physicians.

391.   The physician employees receiving excessive compensation referred beneficiaries of federal and state-funded health care programs, including Medicare and Medicaid, for DHS to Defendant HMA's facilities, an entity with which they had a financial relationship, in violation of the Stark Law, 42 U.S.C. § 1395nn.

392.   None of the Stark Law's exceptions apply to the illegal financial relationship or referrals between Defendant HMA and the referring physicians receiving illegal, excessive remuneration.

393.   The physician employees and those receiving excessive compensation, including

Defendant PAL, acting through its physicians, had a financial relationship with Defendant HMA to which the Stark Law applied, namely the referrals that HMA received from PAL and other physicians, who received illegal, excessive remuneration from Defendant HMA.

394.    The PAL physicians and/or HMA's physician employees referred beneficiaries of federal and state-funded health care programs, including Medicare and Medicaid, for DHS to Defendant HMA, an entity with which they had a financial relationship, in violation of the Stark Law, 42 U.S.C. § 1395nn.

395.    None of the Stark Law's exceptions apply to the illegal financial relationship or referrals between Defendant HMA and Defendant PAL, or the other physicians participating in the excessive employment contracts.

396.    Each referral of a beneficiary of a federal or state-funded health care program, including Medicare or Medicaid, to Defendant HMA's facilities for DHS by a PAL physician or by HMA physicians receiving excessive compensation, constituted a violation of the Stark Law, 42 U.S.C. § 1395nn.

397.    Defendant HMA's claims for funds from federal or state-funded health care programs, including Medicare or Medicaid, related to the tainted referrals it received from Defendant PAL, and/or from physicians to whom HMA paid excessive compensation, constituted violations of the Stark Law,  42 U.S.C. § 1395nn.

398.    Defendant PAL, acting through its physicians, including Defendants Warren and Longton, and other physicians with a financial relationship with HMA who referred beneficiaries of federal or state-funded health care programs, including Medicare or Medicaid, to Defendant

HMA's facilities for DHS are subject to liability under the Stark Law, 42 U.S.C. § 1395nn(a)(1)(A).

WHEREFORE, Relators request the following relief:

A.     Judgment against the Defendants in an amount equal to a refund of all Medicare claims paid for DHS, that resulted from an illegal referral, pursuant to 42 U.S.C. § 1395nn(g)

B.     Imposition of sanctions against Defendants, including denials of payments, and refunds of claims pursuant to 42 U.S.C. § 1395nn(g);

C.     Imposition of penalties of $15,000 for each claim submitted in violation of the Stark Law;

D.     Imposition of penalties of up to $100,000 for each arrangement of scheme which violates the Stark Law;

E.     Their attorneys' fees, litigation and investigation costs, and expenses; and

F.     Such other relief as the Court deems just and appropriate.

### COUNT III (ALL DEFENDANTS) – VIOLATION OF THE FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(1)(A), (B) and (G)

399.    Relators re-allege ¶¶ 1-398 as though fully set forth herein.

400.    Defendant HMA provided incentives to joint venture participants and physician management subsidiary employees to induce improper referrals of services to Defendant HMA's facilities.  Through Defendant PAL's member physicians, and the other joint venture participants in Lancaster Regional, Heart of Lancaster or another HMA facility, HMA received referrals for health services to beneficiaries of federally-funded health care programs in violation of the

federal Anti-Kickback Statute.

401.    Defendants PAL, Warren, Longton, and others conspired with Defendants HMA and Lancaster Regional by assisting in the illegal kickback arrangement, by recruiting PAL physicians to participate in HMA's joint venture of Lancaster Regional, and by demanding an additional $500,000 annual kickback.

402.    Defendants' violations of the federal Anti-Kickback Statute give rise to liability under the federal False Claims Act.

403.    As a prerequisite to participating in federally-funded health care programs, Defendants expressly certified (or, through their participation in a federally funded program, impliedly certified) their compliance with the federal Anti-Kickback Statute.

404.    Defendants HMA, Lancaster Regional and Heart of Lancaster violated the federal False Claims Act by submitting claims for reimbursement from federal health care programs, including Medicare and Medicaid, knowing that they were ineligible for the payments demanded due to federal Anti-Kickback Statute violations associated with the following:   illegal remuneration paid to participants in the various HMA joint venture schemes at HMA facilities, including, but not limited to, those involving Defendant Lancaster Regional and/or Defendant Heart of Lancaster; and excessive compensation HMA paid to its physician employees through bogus co-management arrangements and similar schemes implemented at HMA facilities, including, but not limited to, Heart of Lancaster and Lancaster Regional.

405.    Defendant HMA violated the federal False Claims Act by submitting claims for reimbursement from state health care programs, including Medicaid, knowing that it was

ineligible for the payments demanded due to federal Anti-Kickback Statute violations associated with illegal remuneration paid to participants in the joint venture schemes and excessive compensation paid to HMA physician employees under the guise of co-management services, or similar arrangements.

406.   Claims submitted by Defendant HMA's facilities, including but not limited to, Defendants Lancaster Regional and Heart of Lancaster, to federally-or state funded health care programs (including Medicare, Medicaid, etc.) related to tainted referrals (those stemming from violations of the federal Anti-Kickback Statute) constituted violations of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

407.   Each claim submitted by Defendants to a federally or state-funded health care program (including Medicare, Medicaid, etc.) for a service provided to a patient referred by a joint venture participant or an excessively compensated HMA physician employee is false because it is tainted by an illegal kickback.

408.   Physicians who were employed by Defendant HMA, including but not limited to, Defendant Heart of Lancaster, who received excessive compensation through bogus co-management, personal services, or similar arrangements, had a financial relationship with Defendant HMA to which the Stark Law applied, namely the illegal, excessive remuneration that Defendant HMA paid to them.

409.   Physicians with a financial relationship with HMA referred beneficiaries of federal and state health care programs, including Medicare and Medicaid, for DHS to Defendant HMA's facilities, including but not limited to, Lancaster Regional and Heart of Lancaster,

entities with which they had a financial relationship, in violation of the Stark Law, 42 U.S.C. § 1395nn.

410.   Defendant PAL, acting through its physicians/members, had a financial relationship with Defendant HMA's facility, Lancaster Regional, to which the Stark Law applied, namely the referrals that HMA and its physicians received from PAL members who received illegal, excessive remuneration from Defendant HMA.

411.   Defendant PAL and OB/GYN of Lancaster, acting through their physicians/members, referred participants in federal and state-funded health care programs, including Medicare and Medicaid, for DHS to Defendant HMA, an entity with which they had a financial relationship, in violation of the Stark Law, 42 U.S.C. § 1395nn.

412.   Each referral of a Medicare or Medicaid patient for DHS by a physician with a financial relationship to HMA, or by Defendant PAL or OB/GYN of Lancaster,, acting through their  physicians, to Defendant HMA's facilities constituted a violation of the Stark Law, 42 U.S.C. § 1395nn.

413.   Defendant HMA's claims for Medicare or Medicaid funds related to tainted referrals it received from joint venture participants, including members and Defendant PAL, constituted violations of the Stark Law, 42 U.S.C. § 1395nn.

414.   Claims submitted by Defendant HMA for Medicare or Medicaid funds that are tainted by the Defendants' Stark Law violations constitute violations of the federal False Claims Act, 31 U.S.C. § 3729(a)(1).

415.   HMA knowingly made, used, or caused to be made or used, false records or

statements to cause the United States to pay or approve false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B). The false records or statements were: the false certifications and representations of full compliance with all federal and state laws and false reporting, including, but not limited to, the federal Anti-Kickback Statute and the Stark Laws; bogus joint venture valuation documents and sham co-management agreements.

416.   HMA made or caused to be made such false certifications and representations in agreements under state and federal health care programs, including Medicare and Medicaid, to ensure that these programs would reimburse for services HMA facilities provided to beneficiaries of these programs.

417.   Defendant HMA knowingly made, used, or caused to be made or used, false records or false statements to conceal, avoid, or decrease an obligation by HMA facilities to pay or transmit money or property to the United States, in violation of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

418.   The false records or statements were: the false certifications and representations of full compliance with all federal and state laws and false reporting, including, but not limited to, the federal Anti-Kickback Statute and the Stark Laws; bogus joint venture valuation documents, and sham co-management agreements.

419.   All of the Defendants' conduct described in this Complaint was knowing, as that term is used in the federal False Claims Act.

WHEREFORE, Relators request the following relief:

A.     Judgment against Defendants for three times the amount of damages the United

States has sustained because of their actions, plus a civil penalty of $11,000 for each violation of the federal False Claims Act.

      B.      25% of the proceeds of this action if the United States elects to intervene, and 30% if it does not.

      C.      Their attorneys' fees, litigation and investigation costs, and expenses.

      D.      Such other relief as the Court deems just and appropriate.

**COUNT IV (ALL DEFENDANTS) –
VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
31 U.S.C. § 3729(a)(1)(C) CONSPIRACY**

420.    Relators re-allege ¶¶ 1-419 as though fully set forth herein.

421.    Defendants, through their concerted efforts to carry out Defendant HMA's fraudulent joint venture schemes and bogus co-management arrangements, conspired to defraud the federal government by getting false or fraudulent claims (those related to referrals tainted by violations of the federal Anti-Kickback Statute and the Stark Law) allowed or paid by the government in violation of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

WHEREFORE, Relators request the following relief:

      A.      Judgment against Defendants for three times the amount of damages the United States has sustained because of their actions, plus a civil penalty of $11,000 for each violation of the federal False Claims Act.

      B.      25% of the proceeds of this action if the United States elects to intervene, and 30% if it does not.

      C.      Their attorneys' fees, litigation and investigation costs, and expenses.

D.      Such other relief as the Court deems just and appropriate.

## COUNT V
## FLORIDA FALSE CLAIMS ACT
### Fla. Stat. Ann. § 68.082(2)

422.     Relators re-allege ¶¶ 1-421 as though fully set forth herein.

423.     This is a claim for treble damages and penalties under the Florida False Claims Act, Fla. Stat. § 68.082(2).

424.     By virtue to the acts described above, Defendants knowingly presented or caused to be presented, or conspired to present or cause to be presented false or fraudulent claims to the Florida State Government for payment or approval.

425.     By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Florida State Government to approve or pay such false and fraudulent claims.

426.     The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements.

427.     By reason of the Defendants' acts, the State of Florida has been damaged, and continued to be damaged, in substantial amount to be determined at trial.

428.     The State of Florida is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

WHEREFORE, Relators request the following relief:

- 83 -

A.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Fla. Stat. Ann. § 68.082(2).

## COUNT VI
## GEORGIA STATE FALSE MEDICAID CLAIMS ACT
### Ga. Code Ann. § 49-4-168.1 (a)(1) (2) and (3)

429.    Relators re-allege ¶¶ 1-428 as though fully set forth herein.

430.    This is a claim for treble damages and penalties under the Georgia False Claims Act.

431.    By virtue to the acts described above, Defendants knowingly presented or caused to be presented, or conspired to present or cause to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

432.    By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Georgia State Government to approve or pay such false and fraudulent claims.

433.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements.

434.    By reason of the Defendants' acts, the State of Georgia has been damaged, and continued to be damaged, in substantial amount to be determined at trial.

435.    The State of Georgia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made,

used or presented by Defendants.

WHEREFORE, Relators request the following relief:

A.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the Georgia Medicaid program has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of Ga. Code Ann. § 49-4-168.1 (a)(1) and (2).

**COUNT VII**
**TENNESSEE MEDICAID FALSE CLAIMS ACT**
**Tenn. Code Ann. § 71-5-182(a)(1)(A) (B) and (C)**

436.   Relators re-allege ¶¶ 1-435 as though fully set forth herein.

437.   This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act.

438.   By virtue to the acts described above, Defendants knowingly presented or caused to be presented, or conspired to present or cause to be presented false or fraudulent claims to the Tennessee State Government for payment or approval.

439.   By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Tennessee State Government to approve or pay such false and fraudulent claims.

440.   The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements.

441.   By reason of the Defendants' acts, the State of Tennessee has been damaged, and

continued to be damaged, in substantial amount to be determined at trial.

442.   The State of Tennessee is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

WHEREFORE, Relators request the following relief:

A.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Tenn. Code Ann. § 71-5-182(a)(1)(A) and (B).

Respectfully submitted,

PIETRAGALLO GORDON ALFANO
 BOSICK & RASPANTI, LLP

By:

MARC S. RASPANTI, ESQUIRE
MICHAEL A. MORSE, ESQUIRE
PAMELA C. BRECHT, ESQUIRE
I.D. Nos.: 41350; 62249; 80507
1818 Market Street, Suite 3402
Philadelphia, PA  19103
(215) 320-6200

Attorneys for Plaintiffs
George E. Miller and Michael J. Metts

Dated: September 30, 2015

3013950v5